[No. 18577–2–I.   Division One.   July 27, 1987.]

THE STATE OF WASHINGTON, *Appellant*, v. RONALD
ALLEN PETTY, *Respondent*.

*Norm Maleng, Prosecuting Attorney,* and *John Bell,
Deputy,* for appellant.

*Julie A. Kesler* of *Washington Appellate Defender
Association,* for respondent.

COLEMAN, J.—The State appeals an order suppressing

evidence seized pursuant to a search warrant and an incriminating statement made by the defendant in the course of the execution of the search warrant. We reverse the portion of the order suppressing the physical evidence, but we affirm the portion suppressing the defendant's statement.

On October 15, 1985, Detective Ninomiya, a member of the Seattle Police Department, obtained a warrant based on the following affidavit:

On 10/14/85 your affiant was contacted by a confidential and reliable informant whom your affiant has been working with in excess of twenty–four months. During this period of time this informant has provided your affiant with information regarding narcotics trafficking in the Greater Seattle Area which your affiant has verified as being true and accurate through police and narcotics files, other police personnel[1] and your affiant's own personal knowledge. This informant has made in excess of three controlled buys of controlled substances under the direct supervision of Det. Ninomiya. Further, that during the past twenty–four months this informant has provided information which resulted in the issuance of at least three search warrants where quantities of controlled substances including Marijuana were seized. That as a result of these search warrants, over four individuals have been arrested on narcotics charges. That this informant is familiar with Marijuana and other controlled substances through at least seven years association with users and dealers of the same and his/her own prior use of Marijuana. That information provided by this informant has generally been true and correct.

That within the past two weeks of the above date, this informant went to the above listed residence and did observe a quantity of growing Marijuana. This Marijuana was being cultivated in the basement under a number of halide lights. Further, Marijuana could be smelled not only from the front door, but in the alley located directly north of the premise.

On 10/14/85 at approx. 2000 hours your affiant responded to the above described location, walked through the alley north of the premise in question and detected a [sic] odor of Marijuana. The premise in question borders the alley. Further, your affiant went to the

front door and knocked. A moment later a W/M approx. 30 years of age, 6'1", 220lbs with facial hair answered the door opening it wide open. Your affiant was approx. three feet from the open door and detected a strong odor of Marijuana coming from inside the premise.

Your affiant has found through his police experience and training, eight years as a police officer, 2½ years as a narcotics detective that he is familiar with Marijuana in both its growing and packaged states. Further, that persons growing Marijuana indoors commonly use halide lights and keep records of growth rates and sales of the finished product. That your affiant has been on approx. 50+ search warrants where Marijuana was being cultivated. For the reasons outlined above, your affiant beli[e]ves that there is Marijuana being grown in this residence and a search warrant for controlled substances is requested.

On the same day, Detective Ninomiya and six other detectives executed the search warrant. Four officers approached the door, knocked, and announced that they were police officers, but received no response. When they heard the sound of running inside the house, they forced open the door and entered with their guns drawn. Four people, including the defendant, were discovered in the living room. Right after the detectives entered, Detective Ninomiya asked each person if he lived there. The defendant was the only one who answered affirmatively. A short time later the officers discovered marijuana, growing equipment, cash, guns, and a paper indicating dominion and control over the premises. The defendant was arrested and subsequently charged by information with possession of marijuana with intent to manufacture or deliver.

Prior to trial, the defendant moved to suppress both the evidence seized in the search and the statement he made indicating that he lived at the house. The court suppressed the evidence seized pursuant to the search warrant, concluding that

[t]he informant's information was stale, and the detective's knocking on the door to detect the odor of marijuana when it was opened was an unlawful search.

The odor of marijuana detected by the officer in an alleyway was not sufficient to supply corroboration since there was no indication which house or property the odor could have emanated from. It is impossible to separate these observations from the observations perceived by the unlawful search.

The court also suppressed the defendant's incriminating statement, ruling that

[t]he defendant should have been advised of his constitutional rights before the first statement. That statement is not admissible for that reason and as the fruit of an unlawful search.

The court later entered an additional finding that suppression of the evidence terminated the State's ability to proceed to trial.

We first address the trial court's conclusion that the officer conducted an illegal search when he approached the house, knocked, and detected the odor of marijuana while standing 3 feet outside the open door of the residence. In *State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981), our Supreme Court stated:

The presence of an officer within the curtilage of a residence does not automatically amount to an unconstitutional invasion of privacy. Rather, it must be determined under the facts of each case just how private the particular observation point actually was. It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. . . . An officer is permitted the same license to intrude as a reasonably respectful citizen.

(Footnote omitted.) *Seagull*, at 902. The *Seagull* court held that when an officer approached the house upon an access route impliedly open to the public in order to question the occupants about a nearby abandoned vehicle and the officer discovered what he believed to be marijuana in a green house along the access route, the officer was not conducting a search. *Seagull*, at 905.

In *State v. Daugherty*, 94 Wn.2d 263, 616 P.2d 649 (1980), *cert. denied*, 450 U.S. 958 (1981), a section of a

driveway which was exposed to view from the street and was a means of conventional access to the house was "not protected under the Fourth Amendment either from view by police officers or from an incursion by officers with a legitimate purpose walking across it to reach respondent at the door to his home." *Daugherty*, at 268. When the officers entered a portion of the driveway that the defendant had effectively blocked off and obscured from view, however, they entered an area in which the defendant had a reasonable expectation of privacy. *Daugherty*, at 268–69. Because they had no lawful right to be in this area, the evidence discovered there had to be suppressed.

Petty argues, based on *Seagull* and *Daugherty*, that Detective Ninomiya conducted an illegal search by approaching his front door with the anticipation of smelling incriminating evidence. He contends that the court in *Seagull* upheld the officer's approach to the house only because the officer was seeking information unrelated to any suspicion about the occupant. An officer who approaches a residence in order to acquire information about an occupant, Petty argues, is not acting with a "legitimate" purpose.

Such a narrow interpretation, however, is not supported by the authority relied on in *Seagull* and *Daugherty*. The "legitimate purpose" or "legitimate business" distinction is drawn from cases which hold that even when an officer approaches a residence in connection with an investigation focused on an occupant, the officer does not violate the Fourth Amendment as long as the defendant does not have a reasonable expectation of privacy in the access route used by the officer. *United States v. Magana*, 512 F.2d 1169 (9th Cir.) (officers were lawfully in driveway where they were providing security for other officers who were arresting an occupant), *cert. denied*, 423 U.S. 826, 46 L. Ed. 2d 43, 96 S. Ct. 42 (1975); *Davis v. United States*, 327 F.2d 301 (9th Cir. 1964) (officers lawfully approached house to question defendant they suspected of drug trafficking); *State v. Corbett*, 15 Or. App. 470, 516 P.2d 487 (1973) (officer lawfully approached house to obtain information to be used in

applying for a search warrant). None of these cases holds that an officer's suspicions about an occupant transform the officer's approach to the house into a search.

■ The rationale for finding that an officer in this situation does not violate the constitution is twofold. It is based, first of all, on the conclusion that an officer, like anyone else, may approach a residence from an access route impliedly open to the public.

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir. 1964).

Furthermore, the constitutionality of the officer's action is not undermined by the officer's reasons for approaching the house. An officer's underlying intent or motivation is irrelevant to the judicial inquiry into the lawfulness of the officer's conduct. *See* 1 W. LaFave, *Search and Seizure* § 1.4(e) (2d ed. 1987). Whether a constitutional violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting the officer at the time and not on the officer's actual state of mind at the time the challenged action was taken. *Maryland v. Macon,* 472 U.S. 463, 470–71, 86 L. Ed. 2d 370, 105 S. Ct. 2778 (1985); *Scott v. United States,* 436 U.S. 128, 136–39, 56 L. Ed. 2d 168, 98 S. Ct. 1717 (1978). Thus, if an individual has no reasonable expectation of privacy in a particular area, the police "may enter on a hunch, a fishing expedition for evidence, or for no good reason at all." *State v. Bell,* 108 Wn.2d 193, 205, 737 P.2d 254 (1987) (Pearson, J., concurring in the result). Here, when the officer stood in an area which was not constitutionally pro-

tected[1] and smelled marijuana, that detection did not constitute a search within the meaning of the Fourth Amendment or article 1, section 7.[2]

■ We next address the question of whether the information in the affidavit was stale. An affidavit in support of a search warrant must set forth sufficient facts and circumstances to establish a reasonable probability that criminal activity is occurring or is about to occur. *State v. Higby*, 26 Wn. App. 457, 460, 613 P.2d 1192 (1980). The amount of time between the known criminal activity and the issuance of the warrant is only one factor and should be considered along with all the other circumstances, including the nature and scope of the suspected criminal activity. *Higby*, at 460–61. The test for staleness of information in a search warrant affidavit is one of common sense. *State v. Riley*, 34 Wn. App. 529, 534, 663 P.2d 145 (1983).

The facts in the present case indicate that the trial court erred in ruling that the information was stale because there was a 2–week lapse between the informant's observation and the request for a warrant. While 2 weeks may be too long where the suspected criminal activity is the sale of small amounts of marijuana, *Higby*, at 461, it is sufficient to

---

[1]Petty does not argue that the access route to the house was not impliedly open to the public. Such an issue would be resolved by looking to the factors enumerated in *United States v. Dunn*, ___ U.S. ___, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987).

[2]Petty also cites the case of *State v. Boyce*, 44 Wn. App. 724, 723 P.2d 28 (1986) to argue that the officer's approach to the house was a search under article 1, section 7 of our state constitution. In *Boyce*, however, we addressed the constitutionality of the use of a trained canine to sniff for contraband; we did not question the conclusion that an officer may use his or her own sense of smell without conducting a search. It has frequently been noted that the use of a canine introduces constitutional concerns not present in the analysis at issue here. A narcotics detection dog "does more than merely allow the police to do more efficiently what they could do using only their own senses. A dog adds a new and previously unobtainable dimension to human perception. The use of dogs, therefore, represents a greater intrusion into an individual's privacy." *United States v. Place*, 462 U.S. 696, 719–20, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983) (Brennan, J., concurring in the result). *Boyce*, which holds that article 1, section 7 may place limitations on certain canine sniffs, has no application to the facts before us.

establish probable cause where an informant observes "an extensive growing operation". *State v. Smith,* 39 Wn. App. 642, 651, 694 P.2d 660 (1984). The affidavit here meets this standard by asserting that there was a "quantity of growing Marijuana . . . being cultivated in the basement under a number of halide lights."[3] The nature and scope of this activity indicated to a reasonable probability that the illegality was still occurring 2 weeks after the informant's observation.

Furthermore, even information which is stale standing alone may still provide probable cause if it is confirmed by other more recent information. *State v. Hashman,* 46 Wn. App. 211, 217, 729 P.2d 651 (1986). Thus, even if the informant's tip was stale because of the 2–week lapse of time, the information nevertheless supplied probable cause because it was confirmed by the officer's detection of the odor of marijuana from the doorway of the house only the day before he sought the warrant. The odor of marijuana established that the marijuana growing operation was still functioning despite the lapse of time.

In addition, the officer's detection of the odor of marijuana in the alleyway provided further support for the magistrate's determination of probable cause. A magistrate is entitled to draw reasonable inferences from the facts and circumstances set forth in the affidavit. *State v. Chasengnou,* 43 Wn. App. 379, 385, 717 P.2d 288 (1986). Although an odor in the alleyway, unconnected to any particular residence, might be insufficient to establish probable cause standing alone, the other information which was available here allowed the magistrate to draw the reasonable infer-

---

[3]Petty attempts to distinguish *Smith* by pointing out that the informant in *Smith* also told the police that the operation involved 100 to 150 plants which were 3 to 4 feet tall. *Smith,* at 651. While these additional details are helpful, however, the only essential information is that the nature and scope of the growing operation is such that there is probable cause to believe that it is still occurring despite the lapse of time. To require, as Petty asserts, that the affidavit also set forth information with respect to the growth rates and harvesting of marijuana would require information that is unnecessary to a commonsense evaluation of whether the information is stale.

ence that the odor was connected to the defendant's residence.

■ Finally, we address the trial court's conclusion that the defendant's statement was inadmissible because he should have been advised of his rights before the statement was made. *Miranda* warnings were developed to protect a defendant's right not to make incriminating confessions or admissions to police while in the coercive environment of police custody. *State v. Dictado,* 102 Wn.2d 277, 292, 687 P.2d 172 (1984). "[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty,* 468 U.S. 420, 440, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983)); *see also State v. Harris,* 106 Wn.2d 784, 789–90, 725 P.2d 975 (1986), *cert. denied,* ___ U.S. ___, 94 L. Ed. 2d 781, 107 S. Ct. 1592 (1987). The relevant inquiry focuses on how a reasonable person in the suspect's position would have understood his situation. *Berkemer,* 468 U.S. at 442.

In the present case, seven officers were dispatched to the house to execute the search warrant. Four of the officers approached the house and forcibly entered after they received no response to their knock and announcement. At the time of the forcible entry, Detective Ninomiya and others had drawn their guns. While some of the officers secured the residence, Detective Ninomiya and one other officer contained the four suspects in the living room. Each of the suspects was questioned immediately after the officers made their forcible entry. Presumably while the officers were still displaying their weapons.

"Police conduct is the clearest indication to the suspect of his status, and it is primarily from this conduct that a reasonable man can ascertain whether he is being detained by the police." W. Ringel, *Searches and Seizures, Arrests and Confessions* § 27.3(b), at 27–20 to 27–21 (2d ed. 1986). When an officer draws a weapon in a confrontation with a suspect, it is a strong indication to the suspect that he is in

custody. *Miley v. United States,* 477 A.2d 720, 722–23 (D.C. 1984); *People v. Shivers,* 21 N.Y.2d 118, 233 N.E.2d 836, 839, 286 N.Y.S.2d 827 (1967); *State v. Intogna,* 101 Ariz. 275, 419 P.2d 59, 65 (1966). Although there will undoubtedly be situations in which, despite the presence of a gun, a suspect is not in custody, such a situation is not presented here. The officers' actions in this case would indicate to a reasonable person that his freedom of action had been curtailed to a degree associated with formal arrest.[4]

Furthermore, the question was one which the officer should have known was "reasonably likely to elicit an incriminating response". *Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); *State v. Grisby,* 97 Wn.2d 493, 505, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983). When the police officers executed the search warrant, they had probable cause to believe that marijuana was being grown on the premises. The officer should have known that his question to the suspects about whether they were occupants of the house was likely to elicit an incriminating response.

The order suppressing the defendant's statement is affirmed. The order suppressing evidence seized pursuant to the search warrant is reversed, and the cause is remanded for trial.

SWANSON and GROSSE, JJ., concur.

Review denied by Supreme Court November 4, 1987.

---

[4]We do not mean to suggest that the officers acted improperly in entering the residence with their weapons drawn. Safety concerns may make such an approach absolutely necessary. Our analysis here focuses solely on the coercive environment created by the drawn weapons and the implications of that environment for the applicability of *Miranda.*