[No. 31577-3-I.    Division One.    May 2, 1994.]

THE STATE OF WASHINGTON, *Appellant,* v. JOHN G. GRAFFIUS, *Respondent.*

*Seth R. Dawson, Prosecuting Attorney,* and *David F. Thiele, Deputy,* for appellant.

*J. Bradley Meagher* and *Meagher & French,* for respondent.

SCHOLFIELD, J. — The State appeals an order suppressing evidence of marijuana, arguing that a police officer's intentional, but nonintrusive, open view of marijuana in a garbage can did not violate John G. Graffius' right to privacy. We agree and reverse.

Narcotics detectives received a tip from the FBI that Graffius was growing marijuana. Because they did not have enough information to establish probable cause for a warrant, the detectives decided to conduct a "knock and talk". In a "knock and talk", uniformed officers go to an address and attempt to contact the occupant. If he answers, they tell him they are investigating and ask if they can enter and talk to him. If the occupant refuses, they leave.

Four uniformed officers arrived at Graffius' home at about 5:30 p.m. while it was light. They were in uniform. They used the driveway commonly used for guests and members of the public who were visiting. They parked the police vehicles in the gravel portion of the driveway by the garage. The driveway services two homes by splitting approximately

halfway from its base, one leg leading to a neighboring house and the other leg to Graffius' house.

Upon arrival, Detectives Holeman, Jeske and Hawkins knocked loudly on Graffius' front door. There was no response. A fourth officer went to the north side of the house by the back fence. Detectives Holeman, Jeske and Hawkins then walked down a concrete walkway and returned to the graveled parking area on the north side of the garage. Officer Jeske knocked on a side door of the garage. There was no response. Meanwhile, Detective Holeman saw two garbage cans next to the side door to the garage. The lid was ajar on one can, creating an opening 6 to 8 inches wide. Detective Holeman looked in and saw a fist-sized bud of marijuana on top of a few other pieces of household garbage. He stated that he was not visually searching when he walked by. The marijuana was "clearly visible" about two-thirds of the way down in the can.

Detective Holeman saw the marijuana by natural light; no flashlight was used. He did not move the lid. He left the marijuana in the can. Detective Holeman drew Detective Jeske's attention to the marijuana. From their extensive experience and training, the officers recognized the marijuana as such.

The discovery of the marijuana bud played a material part in the officers' obtaining a search warrant from the judge shortly thereafter. During the search, the officers seized 23 sealed bags of marijuana buds, along with several other bags of trimmings, leaves, and byproducts of a marijuana growing operation. Graffius was subsequently charged with possession of a controlled substance with intent to manufacture or deliver. Graffius sought to suppress the evidence on the ground that the search warrant was tainted by the earlier warrantless intrusion during which the officers saw marijuana in Graffius' partially open garbage can.

The trial court found as a matter of fact that the officers' vantage point when viewing the marijuana was a public parking area that was open by implied invitation. There was no expectation of privacy in the area. Accordingly, the

officers were lawfully situated when viewing the marijuana. However, the trial court then concluded that when Detective Holeman took the "extra effort to intentionally (not accidentally) look into a partially closed garbage can instead of simply walking past" as other members of the public would have done, he unreasonably intruded into Graffius' private affairs. Report of Proceedings, at 68. The trial court suppressed the evidence.

This appeal timely followed.

### Right of Privacy

The issue here is whether the officer's intentional look into the partially open garbage can constituted an unreasonable intrusion into Graffius' privacy. The State contends that the officer had an intentional, but nonintrusive, open view of garbage which did not violate Graffius' right of privacy. Graffius responds that the extra effort the officer took to intentionally look into the partially open garbage can, instead of simply walking past it as other members of the public would have done, constituted an unreasonable intrusion into Graffius' privacy.

■ The mere observation of that which is there to be seen does not necessarily constitute a search within the meaning of the Fourth Amendment or article 1, section 7 of the Washington Constitution. *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). The open view doctrine states as follows:

> As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" within the meaning of the Fourth Amendment.

*Seagull*, at 901 (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.2, at 240 (1978)).

■ An officer with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing he is free to keep his eyes open. However, either (1) a substantial and unreasonable departure from such an area or (2) a particularly intrusive method

of viewing will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. *Seagull*, at 902-03.

Here, the trial court correctly found that the gravel parking area was impliedly open, and the police, being on legitimate business, could enter. There was no expectation of privacy in this area. The officer's departure from the public parking area toward the garbage cans was not a "substantial and unreasonable" departure from the parking area. In fact, the trial court found that the officer did not depart from the public parking area at all.[1]

The question thus becomes whether the officer's intentional, rather than accidental or unintended, look into the garbage can was "particularly intrusive". *Seagull*, at 903. In determining whether an officer exceeded the scope of an "open view", one must consider several factors, including whether the officer (1) spied into the house; (2) acted secretly; (3) approached the house in daylight; (4) used the normal, most direct access route to the house; (5) attempted to talk with the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally. *Seagull*, at 905.

In *Seagull*, the officer was lawfully beside the defendant's house when he came upon a greenhouse. The greenhouse was covered with translucent plastic, and the officer was able to identify marijuana through a crack in the plastic 6 to 10 feet away. In upholding the trial court's refusal to suppress the evidence, the court reasoned that

[1] [the officer] did not spy into a residence. He merely looked at a greenhouse which was visible from both the parking area and the entire side yard including the area which, it was admitted, was the access route to the north door. [2] It is evident from the map introduced by petitioners that the officer's

---

[1]Graffius argues that the officer had unreasonably departed from the curtilage at the time he viewed the contents of the garbage can. Graffius fails to assign error to the trial court's finding to the contrary — that the parking area, which included the garbage can storage area, was open by implied invitation. Although he is the Respondent, Graffius could have assigned error to the trial court's finding. *Burt v. Heikkala*, 44 Wn.2d 52, 54, 265 P.2d 280 (1954). His failure to do so means that the finding must be treated as a verity for the purpose of this appeal. *Mayo v. Jones*, 8 Wn. App. 140, 147-48, 505 P.2d 157 (1972).

route to the north door would have been a normal one to take if he had gone directly to that door from his car in the parking area. [3] The officer was not secretive; rather, [4] he acted openly in an honest attempt to talk with the occupants of the house. [5] He did not get as close to the greenhouse as he could have; instead he kept his distance. [6] The discovery was accidental in that he did not go to the residence with the purpose of viewing or looking for contraband. He did not create an artificial vantage point from which to advance his observation. Further, [7] all acts occurred during daylight hours.

*Seagull*, at 905.

Similarly, here, Detective Holeman did not use a particularly intrusive method of viewing. (1) He did not spy into a residence. He merely looked into a partially open garbage can that he passed while walking in the parking area which was open by implied invitation. (2) The path which Detective Holeman took down the concrete walkway and next to the garage is a normal one for an ordinary member of the public attempting to see if someone is home. (3) Detective Holeman did not spy into the residence or the garage, nor did he act secretly; (4) he acted in an honest attempt to talk with the occupant of the house. He and three other officers knocked on the door several times, while a fourth officer looked in the back yard. With regard to Detective Jeske knocking on the garage door, it was not unreasonable for him to believe that Graffius might be in his garage, especially considering his two vehicles were parked in the driveway. (5) After knocking on the door to the house, Detective Holeman passed the garbage can. He did not create an artificial vantage point from which to advance his observation. He did not remove the lid or shine a flashlight down into the garbage can. He simply looked down into the 6- to 8-inch opening caused by the lid being ajar. (6) He stated that he was not visually searching when he walked by the garbage can. (7) In addition, the discovery of the marijuana occurred during daylight hours, and the marijuana was clearly visible with natural lighting.

Furthermore, the trial court erroneously concluded that there is a distinction between standing 6 to 10 feet away from a greenhouse and noticing a marijuana plant

through a crack in the plastic (as was approved in *Seagull*), and standing immediately next to a garbage can and looking down through a 6- to 8-inch opening where the lid is ajar (as was done in this case). Appellate review of a conclusion of law, based upon findings of fact, is limited to determining whether a trial court's findings are supported by substantial evidence, and if so, whether those findings support the conclusion of law. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise. *American Nursery Prods., Inc.*, at 222.

In reviewing the record, we find substantial evidence to support the trial court's finding of fact that "the officers peered into a garbage can that had an ajar lid, and made some concerted effort to identify what was two-thirds of the way down". Report of Proceedings, at 71. The record indicates that the officer stood immediately over the garbage can and looked down into the 6- to 8-inch opening created by the lid being ajar and saw marijuana. However, this finding does not support the legal conclusion that the officer used a particularly intrusive method of viewing sufficient to distinguish it from *Seagull.*

First, a police officer who approaches a common access route may do so with his eyes open. *Seagull*, at 902. Here, while walking along the gravel driveway, the officer passed two garbage cans. The officer testified that he was not "visually searching" when he walked by. He did not use a flashlight or move the garbage can lid. The trial court distinguished this case from *Seagull* on the basis that this case involved an officer's intentional look, whereas *Seagull* involved an unintentional viewing of marijuana. An intentional look alone is not a particularly intrusive method of viewing. Looking down into a partially open garbage can is no more intrusive than standing 6 to 10 feet away from a greenhouse and noticing a marijuana plant through a crack in the plastic. We find that the trial court erred with regard to this conclusion.

The State cites *State v. Petty*, 48 Wn. App. 615, 740 P.2d 879, *review denied*, 109 Wn.2d 1012 (1987) and *State v. Patterson*, 37 Wn. App. 275, 679 P.2d 416, *review denied*, 103 Wn.2d 1005 (1984), in support of its argument that an intentional look here was not "particularly intrusive". Under *Petty*, Detective Holeman's intentional as opposed to accidental look into the partially open garbage can would not be "particularly intrusive" because a deliberate intention to gather evidence when the investigation has focused on the occupant does not invalidate an open view. *Petty*, at 619-20. In addition, the former "inadvertent discovery" element of the related plain view doctrine[2] does not mean the officer must act with a completely neutral or benign attitude when investigating suspicious activity. *Patterson*, at 281.[3] Therefore, the fact that Officer Holeman "peered into a garbage can that had an ajar lid, and made some concerted effort to identify what was two-thirds of the way down" as found by the trial judge, does not mean that he was using a particularly intrusive method of viewing because the conduct of an investigation necessitates inquiry. *Patterson*, at 281.

Furthermore, even absent *Petty* and *Patterson*, we conclude that the officer's intentional look was permissible. An officer should not be expected to walk around with blinders on. Although under the open view doctrine an officer should stay within the curtilage of the house and the public areas, he should not be required to avert his glance from every partially open garbage can or other container. An officer is trained to observe to a higher degree than the average

---

[2]Inadvertent discovery has been eliminated as a requirement of plain view. *Horton v. California*, 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990).

[3]Although *Patterson* involves a plain view, while the present case involves an open view, it is questionable whether any distinction need be made between the "plain view" and "open view" doctrines, the crucial factor for Fourth Amendment purposes being whether the officer impermissibly intruded on a reasonable expectation of privacy. *State v. Callahan*, 31 Wn. App. 710, 712 n.1, 644 P.2d 735 (1982). The principle distinction between the plain view and open view exception depends upon whether the officer is viewing the evidence from an intrusive or nonintrusive vantage point. *State v. Hansen*, 42 Wn. App. 755, 761-62, 714 P.2d 309, *aff'd*, 107 Wn.2d 331, 728 P.2d 593 (1986).

citizen. Thus, as the trial court said, to expect an officer not to glance into an open garbage can because an average citizen would not creates an unrealistic standard. Moreover, it is impractical from a law enforcement standpoint to say that an officer's glance is particularly intrusive if he makes the effort to look down into a garbage can when the lid is ajar, while an officer's glance is not particularly intrusive if there is no lid on the garbage can, thus enabling him to observe a marijuana bud with slightly less effort. Therefore, we find that an intentional look, as contrasted with an unintentional look, without more, is not a "particularly intrusive method of viewing".

Graffius cites *State v. Boland*, 115 Wn.2d 571, 800 P.2d 1112 (1990), in support of his argument that he has a reasonable expectation of privacy in his garbage. While *Boland* protects a privacy interest in garbage, the facts in *Boland* are so completely different from those in this case that *Boland* does not support the trial court's position.

Accordingly, although Graffius generally has a privacy right in his garbage, here he left his garbage can partially open, exposing some contraband within. The officer viewed it from a nonintrusive vantage point at the edge of Graffius' driveway and the officer's intentional look down into the garbage can did not constitute a particularly intrusive means of viewing. It was an open view and did not violate article 1, section 7 of our constitution. Accordingly, the evidence should not have been suppressed.

We reverse.

WEBSTER, C.J., and AGID, J., concur.