[Nos. 13389-3-III; 13390-7-III.   Division Three.   June 22, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. LYLE J. COUTIER*, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL J. GATES, *Appellant*.

---

*Although this spelling appeared on the information and "Coultier" was the spelling on the amended information, we have used the correct spelling in the opinion.

*Thomas Bothwell, Prediletto, Halpin, Scharnkiow, Both-well, Smart,* for appellant Coutier.

*Eric R. Weston,* for appellant Gates.

*John D. Knodell, III, Prosecuting Attorney,* for respondent.

SCHULTHEIS, J. — Michael Gates and Lyle Cloutier each pleaded guilty to a misdemeanor count of possession of marijuana and reserved the right to appeal denial of their suppression motions. They contend the arresting officer lacked grounds to conduct a warrantless search of their vehicle's glove box in which the marijuana was found. We reverse.

On November 18, 1992, at 5:44 p.m., Washington State Patrol Trooper Steven Smith observed a Ford Bronco towing a camper trailer. Although the vehicle was moving forward at highway speed, the camper's white backup lights were on. He pulled the vehicle over and alerted the driver to the defective lighting. The driver, Mr. Gates, exited as directed. The trooper produced a roll of electrical tape and suggested Mr. Gates place tape over the lights until they could be repaired. Mr. Cloutier exited the Bronco and proceeded to perform this task. Trooper Smith observed that Mr. Cloutier appeared pale and was unsteady on his feet. The trooper spoke with Mr. Gates and asked for his driver's license, vehicle registration and proof of insurance. At some point in this conversation, Mr. Gates advised the trooper that he and his party were going hunting. Mr. Gates produced his license but not the other documents. He had recently purchased the Bronco and did not think he had either document. Mr. Gates informed the officer that the information was not in the glove box, but Trooper Smith asked him to check his glove box anyway for the missing documentation. The exact nature of this request is unclear.

> I asked him to check the glove box for the registration and proof of insurance. He was somewhat hesitant, but after some—I don't know how to put it. I convinced him to have a look in the glove box to see if he could find a registration for me.

Mr. Gates re-entered the vehicle in an awkward manner. He knelt on the driver's seat and tried to position his body between the glove box and the trooper. Reaching into the glove box, he pushed the lid up against his arm. Trooper Smith shone a flashlight at the glove box through

the driver's window and Mr. Gates constantly shifted his body to keep the beam from focusing on the glove box. A 12-year-old passenger assisted him in these efforts.

> And at the same time the young man in the back seat was leaning over the back of the front seat. And also holding the lid up. And they were conversing back and forth. Each time I would attempt to get a look at what was inside the glove box he would move to restrict the light beam from my flashlight. If I moved it to the right, he would move to the right, and if I moved it to the left, he'd move to the left, and so on. Finally I was able to shine the light by moving the light quickly, and at that time I observed what appeared to be controlled substance.

Trooper Smith observed a plastic baggie which he took to be marijuana because of the common usage of baggies for this purpose. He could not see the contents of the baggie at the time. Trooper Smith walked around the vehicle to the passenger window during which time Mr. Gates closed the glove box. The trooper announced he believed the glove box contained a controlled substance and told Mr. Gates to re-open it. Mr. Gates did so and the trooper recognized a baggie of marijuana. Mr. Cloutier had been behind the camper throughout this time applying tape over the lights.

Both men were charged with felony possession. An amended information was later filed charging misdemeanor possession. Trooper Smith testified at the suppression hearing that he was a safety conscious officer with 19 years of experience who "had firearms pulled on me on numerous occasions. . . . If I see a firearm, generally my firearm comes out". He felt uneasy about Mr. Gates' statement that the men were going hunting when coupled with the furtive gestures in blocking his view. However, he did not draw his weapon, or frisk any of the vehicle's occupants or call for backup. The reason he was shining a flashlight toward the glove box was for officer safety, but at the same time, he wanted "to get a look at what was inside the glove box . . .". The trooper believed Mr. Gates was trying to hide something from his view, although he had no idea what it was prior to seeing the baggie.

At the close of the hearing, the court granted the motion to suppress because the trooper's "purpose in directing that the glove box be opened had nothing to do with

personal safety, but was to examine the plastic bag to determine what it contained". The State moved for reconsideration and submitted supplemental authority. On reconsideration, the court continued to hold the view that Trooper Smith's real motive was to search for contraband and that he had no probable cause to do so. Searching for evidence was Trooper Smith's announced purpose in directing Mr. Gates to re-open the glove box. The court also found the trooper established through both his testimony and his actions that he had no serious apprehension over his personal safety. The court reversed itself, however, on the import of the furtive gestures by holding they would have supplied a reasonable officer with grounds for safety concerns notwithstanding that Trooper Smith did not subjectively share those concerns. After surveying the varying authorities, the court summed up its ruling as follows:

> I come down on the side of LaFave, saying that the rule, for perhaps other reasons, really should be as announced in the *Scott* case in regard to that seizure. And that rule would be that where the officer proceeds on an incorrect legal theory to justify his action, but where his intrusion is precisely the same as it would have been under the correct theory, that the search is not unreasonable and that the exclusion under a suppression motion should be denied.

The trial court adopted *Scott v. United States,* 436 U.S. 128, 56 L. Ed. 2d 168, 98 S. Ct. 1717, *reh'g denied,* 438 U.S. 908 (1978). *Scott,* at 138, held that:

> [T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.

Thus, a search for evidence which would be invalid under the theory used by the officer at the time of the search may be upheld if sustainable under another theory. *Scott* has been cited with approval in several Washington cases, but not in relation to protective searches. *State v. Chapin,* 75 Wn. App. 460, 466-68, 879 P.2d 300 (1994) (improper

motive in effecting traffic stop irrelevant if officer without the improper motive would have stopped anyway), *review denied,* 125 Wn.2d 1024 (1995); *State v. Goodin,* 67 Wn. App. 623, 626-27, 838 P.2d 135 (1992) (use of valid warrant not pretextual even if police subjectively believe additional incriminating evidence outside the scope of the warrant will be uncovered), *review denied,* 121 Wn.2d 1019 (1993); *State v. Petty,* 48 Wn. App. 615, 620, 740 P.2d 879 ("An officer's underlying intent or motivation is irrelevant to the judicial inquiry into the lawfulness of the officer's conduct"), *review denied,* 109 Wn.2d 1012 (1987), *cited with approval in State v. Maxfield,* 125 Wn.2d 378, 399 n.39, 886 P.2d 123 (1994) (dicta); *State v. Davis,* 29 Wn. App. 691, 701 n.8, 630 P.2d 938, 17 A.L.R.4th 53 (officer acting under impound theory may later rely on exigent circumstances), *review denied,* 96 Wn.2d 1013 (1981).

■ Historically, Washington courts reviewing vehicular protective searches have considered both subjective and objective components. An officer must be able to articulate reasons supporting a belief that his safety may be compromised if he does not undertake a protective search and such belief must be objectively reasonable. *State v. Terrazas,* 71 Wn. App. 873, 879, 863 P.2d 75 (1993), *review denied,* 123 Wn.2d 1028 (1994); *State v. Feller,* 60 Wn. App. 678, 682, 806 P.2d 776, *review denied,* 117 Wn.2d 1005 (1991); *State v. Sistrunk,* 57 Wn. App. 210, 215-16, 787 P.2d 937 (1990). It is difficult to see how the subjective component could be wholly eliminated. The officer's perception of events, what he observed and how he interpreted it, why he reacted as he did, are all subjective in nature and set the stage for determining whether his reaction was objectively reasonable. Imposing a threshold subjective test impedes legitimate safety searches only marginally, if at all, and does not do violence to the proposition that, ultimately, the question hinges on objective reasonableness.

A problem with the pure objective approach is that of establishing what a reasonably prudent officer would do faced with a given set of circumstances.

We do not, by adopting the objective approach, intend to turn suppression hearings into a lengthy debate over the normal practices and procedures of the police agency in question. Normally, the testimony of the officer involved in the stop should suffice to establish what those practices and procedures are.

*Chapin,* at 468 n.16.

The testimony of the officer involved in the stop was not helpful in ascertaining what a reasonable police officer would do because his testimony was that he did not do what the trial court found a reasonable police officer would have done. The court was left with no evidence to weigh and no standard to apply other than its own insight. Trooper Smith, a safety conscious officer with 19 years of experience who has had weapons pulled on him numerous times, saw no cause for alarm. There is no basis in the record for concluding a hypothetical reasonable officer would have reacted differently.

The court found that "Mr. Gates, although he hesitated and was reluctant, voluntarily entered into the glove box for the purpose of, the ostensible purpose of, retrieving or searching for those documents". This finding is not supported by the evidence. The sum total of testimony going to why Mr. Gates opened the glove box is set out below.

> I asked him to check the glove box for the registration and proof of insurance. He was somewhat hesitant, but after some—I don't know how to put it. I convinced him to have a look in the glove box to see if he could find a registration for me.

This is slim evidence on which to base a finding of voluntariness. The burden was on the State to prove a valid exception to the warrant requirement. *State v. Collins,* 121 Wn.2d 168, 172, 847 P.2d 919 (1993). The finding is not supported by the evidence.

The parties and the trial court refer repetitively to furtive gestures. However, this is not quite the right term. "Furtive" means "taken, done, used, etc., surreptitiously or by stealth". *Random House Dictionary* 778 (2d ed. 1987). Mr. Gates was openly communicating with his body move-

ments, and what he was communicating was "Okay. If you say I have to open the glove box I will, but you're not going to see what's in it". That is exactly how Trooper Smith interpreted what he saw, and having made that connection, determined that if Mr. Gates did not want him to view the contents, he definitely had to find out what was being hidden. This was not a consensual search.

Reversed.

SWEENEY, A.C.J., and MUNSON, J., concur.

Review denied at 128 Wn.2d 1019 (1996).