[No. 40522-5-I.    Division One.    September 14, 1998.]

THE STATE OF WASHINGTON, *Appellant*, v. IVAN BRENT DEARMAN, *Respondent*.

*James H. Krider, Prosecuting Attorney*, and *David F. Thiele, Deputy*, for appellant.

*Mark D. Mestel* of *Mestel & Muenster*, for respondent.

AGID, A.C.J. — The State appeals the trial court's order suppressing evidence seized from Ivan Dearman's home with a search warrant obtained after police used a narcotics dog to determine whether there was a marijuana grow operation in the garage. Dearman cross-appeals, contending the trial court erred in determining that police had a legitimate investigative reason to be at his residence even after they determined no one was there. Because using a trained narcotics dog to detect marijuana in the garage adjacent to a private residence constituted a search under *State v. Young*,[1] a search warrant was required. We therefore affirm.

## FACTS

In early 1993, an unnamed caller informed police that

---

[1] 123 Wn.2d 173, 867 P.2d 593 (1994).

Ivan Dearman was growing marijuana and described his vehicle. Police confirmed that such a vehicle was registered to Dearman but closed the investigation when they were unable to associate him with any marijuana grow operation. In the spring of 1995, a reliable confidential informant told police that someone named 'Ivan' was distributing marijuana. The informant was unable to give them any other information except the name of a possible associate. Police determined that Dearman might be living in the house at 7809 20th N.E. in Arlington. On September 29, 1995, two officers went to that address to investigate. Detective Cheryl Braley went up to the front door and knocked loudly but got no answer. The second officer heard a humming noise coming from the adjacent garage similar to that given off by electrical ballasts used in marijuana grow operations. Neither officer was able to detect the odor of marijuana coming from the house or the garage.

On October 3, police returned to survey the house and observed a person who appeared to be Dearman. They were too far away to positively identify him. Police returned a third time on October 10 and, acting in an undercover capacity, watched the house from a distance. After they saw the person they believed was Dearman and a woman who appeared to live in the house leave, they approached the house and parked in the driveway.[2] They did not have a warrant to search the house. Detective Braley went to the front door, knocked, and got no response. Because police had not been able to detect the odor of marijuana on their previous visit, Detective Helfers, a trained canine handler, and his narcotics dog, Corky, accompanied the detective. After Detective Braley ascertained that no one was home, Helfers told the dog to sniff along the horizontal door seams of the garage to see if he could detect the odor of marijuana. Corky smelled marijuana and alerted. Police left the residence and obtained a search warrant. When they executed the warrant, they seized marijuana found growing in the garage.

---

[2]The facts concerning October 10 are based on the trial court's unchallenged findings of fact.

Dearman was charged with manufacturing a controlled substance. Before trial he moved to suppress the evidence seized from the garage, arguing that police may not use illegally obtained information as a basis for a search warrant. The trial court found that police were lawfully on the premises and had a reasonable suspicion, but not probable cause, to believe that marijuana was present.[3] It also found that police had a legitimate investigative reason to be on the premises which did not end when they learned no one was home. But the court concluded a narcotics dog is a sense-enhancing device within the meaning of *State v. Young* and therefore a search warrant was required. Because police did not have a warrant before they used Corky, the court granted Dearman's motion to suppress. The practical effect of its decision was to terminate the case.

## DISCUSSION

Article I, section 7, of the WASHINGTON CONSTITUTION provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The CONSTITUTION thus protects both a person's home and his or her private affairs from warrantless searches.[4] The relevant inquiry in determining whether there has been a search under the WASHINGTON CONSTITUTION is " 'whether the State has unreasonably intruded into a person's "private affairs." ' "[5] If a search occurs, article 1, section 7, is implicated and police must get a warrant or the search

---

[3]The State does not challenge this finding.

[4]*Young*, 123 Wn.2d at 181.

[5]*Id.* (quoting *State v. Boland*, 115 Wn.2d 571, 577, 800 P.2d 1112 (1990). In addition to "private affairs," article 1, section 7, explicitly protects the "home." *Id.* at 185. Under Washington law, the home receives heightened constitutional protection and is treated as a highly private place which can be "invaded" even though there is no physical entrance into the house. *Id.* For that reason, " 'the closer officers come to intrusion into a dwelling, the greater the constitutional protection'." *Id.* (quoting *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984)). *See also Chrisman*, 100 Wn.2d at 822 (the "heightened protection afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of

must fall within one of the recognized exceptions to the warrant requirement. "[W]hen a law enforcement officer is able to detect something by [using] one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a 'search'."[6] For that reason, courts have held that a police officer's visual surveillance does not constitute a search if the officer observes an object with the unaided eye from a nonintrusive vantage point.[7] This kind of surveillance does not violate article 1, section 7, because what is voluntarily exposed to the general public and observable from an unprotected area without using sense enhancement devices is not part of a person's private affairs.[8] But "a substantial and unreasonable departure from a lawful vantage point, or a particularly intrusive method of viewing, may constitute a search."[9] In *Young*, the Washington Supreme Court held that an infrared device is an intrusive means of observation which exceeds the limits on surveillance under

our warrant requirement") (quoted in *Young*, 123 Wn.2d at 186). We recognize the result in this case might be different had the garage been at some distance from the house. But here we afford it the same level of protection because it was right next to the home.

[6] *Young*, 123 Wn.2d at 182 (quoting *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981)).

[7] *Id.* Here, police appear to have been on the route that a person approaching the house would normally use to reach the front door. A photograph of the house shows the driveway leading directly to the garage which is adjacent to the house to its right. The path to the front door begins close to the bottom left-hand corner of the garage and goes straight along the front of the house. *See State v. Rose*, 128 Wn.2d 388, 392, 909 P.2d 280 (1996) (police with legitimate business may enter areas of the curtilage which are impliedly open such as access routes to the house); *State v. Daugherty*, 94 Wn.2d 263, 268-69, 616 P.2d 649 (1980) (that portion of driveway which represents conventional access to door is impliedly open), *cert. denied*, 450 U.S. 958 (1981). While police used the normal, most direct access route to the house, they deliberately avoided contact with the residents on this visit, "spied" into the house by using a means other than their own senses to detect what could normally not be detected from outside, and arguably created an artificial vantage point (an ordinary visitor approaching the front door would be highly unlikely to press his nose against the seams of the garage door). *See Seagull*, 95 Wn.2d at 905 (listing factors to determine whether the open view doctrine has been violated); *State v. Graffius*, 74 Wn. App. 23, 27, 871 P.2d 1115 (1994).

[8] *Young*, 123 Wn.2d at 182.

[9] *Id.* at 182-83 (citing *State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991); *Seagull*, 95 Wn.2d at 901).

Washington law because it allows police to detect heat distribution patterns undetectable to the naked eye or other senses.[10]

■ Like using an infrared thermal detection device, using a narcotics dog goes beyond merely enhancing natural human senses and, in effect, allows officers to " 'see through the walls' of the home."[11] The record is clear that officers could not detect the smell of marijuana using only their own sense of smell even when they attempted to do so from the same vantage point as Corky. As in *Young*, police could not have obtained the same information without going inside the garage.[12] It is true that a trained narcotics dog is less intrusive than an infrared thermal detection device. But the dog *"does* expose information that could not have been obtained without the 'device' "[13] and which officers were unable to detect by using " 'one or more of [their] senses while lawfully present at the vantage point where those senses are used.' "[14] The trial court thus correctly found that using a trained narcotics dog constituted a search for purposes of article 1, section 7 of the WASHINGTON CONSTITUTION and a search warrant was required.[15]

The State argues that because a dog detects the same

[10]*Id.* at 183.

[11]*Id.*

[12]*Id.* at 183 n.1; 191 (device revealed a critical fact about the interior of the premises that the government " 'could not otherwise have obtained without a warrant' ") (quoting *United States v. Karo*, 468 U.S. 705, 715, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984)).

[13]*Id.* (Emphasis in original.)

[14]*Id.* at 182 (quoting *Seagull*, 95 Wn.2d at 901).

[15]While it is unnecessary to reach the question raised in Dearman's cross appeal, i.e., whether police had a legitimate investigative reason to be on the property even after they learned no one was home, we agree with the trial court that they did. Ironically, although the State does not challenge the trial court's finding that police had only a reasonable suspicion and not probable cause, they may well have had enough information to obtain a search warrant, at least under this court's more recent decisions. In addition to a humming noise like electrical ballasts used in marijuana grow operations, police observed that the garage windows were covered with a white vinyl material similar to the vapor barrier commonly used to keep the lights in a marijuana grow operation from being detected. There were also spider webs on all sides of the garage door, indicating that it had not

kind of molecules a human detects, albeit in far smaller numbers, it merely enhances a human sense and is more similar to a pair of binoculars than to an infrared thermal detection device. It notes that in *Young*, the court rejected the argument that the heat emanations detected by infrared are similar to odor emanations detected by trained dogs.[16] But *Young* also expressly stated its approval of the reasoning in *United States v. Thomas*.[17] In *Thomas*, the court held that using a trained dog to sniff for narcotics outside the defendant's apartment door constituted a search that, absent a warrant, violated the Fourth Amendment.[18] As *Young* observed, *Thomas* attached significance both to the method of sensory enhancement and to the fact that a residence was involved. *Young* quoted the following language from that decision:

> With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument. Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door . . . . Because of [the] defendant['s] heightened expectation of

been opened in some time. Police had obtained electric utility records showing that the current tenant used up to twice as much electricity each month as the previous tenant, a pattern which is consistent with marijuana grow operations.

[16]*Id.* at 192. In *Young* it was the State which urged the court to draw a direct analogy between the two.

[17]757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819 (1985) (cited with approval in *Young*, 123 Wn.2d at 194).

[18]The State urges us to rely instead on *United States v. Colyer*, 878 F.2d 469 (D.C. Cir. 1989), which declined to apply the *Thomas* reasoning to a dog sniff of a train sleeper compartment. But the *Colyer* decision was handed down in 1989, five years before the decision in *Young*. Given our Supreme Court's express endorsement of the reasoning in *Thomas*, notwithstanding that it was presumably well aware of the *Colyer* decision, we decline to do so.

privacy inside his dwelling, the canine sniff at his door constituted a search . . . . [19]

The *Young* court added that *Thomas* "correctly recognized that when a private dwelling is the object of a search, and the means used reveal more than what a person can be said to knowingly expose, the protections of the Fourth Amendment are triggered."[20] For that reason, it held that "[w]hen the police use sense-enhancing devices to obtain information from someone's home that could not be obtained by unaided observation of the exterior, they should have a search warrant."[21] Under this rule, the trial court properly concluded that police had to get a search warrant before they could use a trained narcotics dog to search Dearman's residence.

Affirmed.

WEBSTER and ELLINGTON, JJ., concur.

Review denied at 137 Wn.2d 1032 (1999).

---

[19]*Young*, 123 Wn.2d at 194 (quoting *Thomas*, 757 F.2d at 1367).

[20]*Id.* at 194. The court noted none of the Washington appellate court cases where warrantless dog sniffs were approved involved private residences. *Id.* at 188 (citing *State v. Stanphill*, 53 Wn. App. 623, 769 P.2d 861 (1989) (dog sniff of package at post office); *State v. Boyce*, 44 Wn. App. 724, 723 P.2d 28 (1986) (dog sniff of safety deposit box at bank); *State v. Wolohan*, 23 Wn. App. 813, 598 P.2d 421 (1979) (dog sniff of parcel in bus terminal not a search), *review denied*, 93 Wn.2d 1008 (1980)). In each of these cases, the courts acknowledged a dog sniff might constitute a search if the object or location of the search were subject to heightened constitutional protection. *Id.* at 188.

[21]*Id.* at 194 (citing *Karo*, 468 U.S. at 714).