[No. 61120-3. En Banc. December 8, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK PHILLIP MAXFIELD, ET AL, *Appellants*.

*Doherty Ritchie Law Offices,* by *Craig A. Ritchie,* for appellants.

*C. Danny Clem, Prosecuting Attorney,* and *Kevin P. Kelly, Deputy,* for respondent.

ANDERSEN, C.J. —

## FACTS OF CASE

Defendants appeal their convictions for possession of a controlled substance with intent to deliver and for manufacture of a controlled substance. They claim the trial court erred in denying their motion to suppress evidence obtained as a result of a disclosure by a public utility district employee and through an on-site investigation by an informant.

During the summer of 1991, defendant Mark Phillip Maxfield was involved in two marijuana grow operations, one in Clallam County and one in Jefferson County. His wife, defendant Pamela A. Maxfield, was involved in the operation of the marijuana grow in Jefferson County. The investigation of both marijuana grow operations began when a Clallam County Public Utility District (PUD) employee

informed law enforcement that electrical power consumption at a residence in Sequim, Washington, was high.

On June 6, 1991, a Sequim police officer assigned to the Clallam County Drug Task Force (Drug Task Force)[1] received a telephone call from the PUD employee. The PUD employee told the officer that power usage at 431 Atterbury Road in Sequim was high. He indicated that there were two meters at the residence, one on the house, which indicated low readings, and one on the garage, which showed high power usage. The PUD employee told the officer that it would take some extremely heavy equipment to have that kind of high reading and that two transformers providing service to the garage had blown and a third, heavier duty transformer had been installed.

The PUD employee indicated to the Drug Task Force officer that the records could be examined only after law enforcement filed a request for inspection.

The officer filed such a request and inspected the PUD records.

The PUD employee involved here had been employed by the PUD since 1973 and in 1991 was the PUD's treasurer-comptroller. He also was designated by the PUD as the contact person for law enforcement officers requesting records pursuant to the state public disclosure act, RCW 42.17, and in that capacity had had contact with Drug Task Force members several times with regard to other cases prior to June 6, 1991. The PUD employee had never initiated contact with the officer involved here before that date, had not been directed to call law enforcement with suspicious power readings, and had not been asked to find out about the residence at 431 Atterbury Road.

The PUD employee testified that he could not recall the specific instance involved here, but that he did not survey power company records looking for high consumption. He

---

[1]The Clallam County Drug Task Force is a multiagency task force responsible for policing drug activity in Clallam County. The Drug Task Force participants include representatives from the Clallam County Sheriff's office, and the Sequim, Forks, Port Angeles, and Neah Bay police departments.

stated that he most likely received such information from a meter reader. When he learned of suspiciously high power consumption he might suggest the meter reader contact the Drug Task Force or he might call the Drug Task Force himself, simply to give them an address.

He also testified that during the year preceding the present case a member of the Port Angeles Police Department, who was not a member of the Drug Task Force, attended a PUD general employees' meeting to discuss the problem of illegal drug use in Clallam County. Further, the PUD employee testified that he knew the police were always interested in any information from any source regarding drugs.

The PUD employee had initiated contact with the Drug Task Force approximately six times, always on his own initiative. He had never been asked by police about a particular individual and had never been asked by police to provide any information without a written request.

The information contained in the PUD records involved here triggered an investigation that eventually implicated defendants in the marijuana grow operations.

As part of the investigation, a private investigator, who was a former police officer, was asked by the Drug Task Force to aid in the investigation of this case. The investigator testified that he went to the address at 431 Atterbury Road on June 27, 1991, to see if he could find evidence of a marijuana grow operation. He testified that he went to the house and knocked on the door. There was no answer, but he heard noises in the garage, so he walked across the driveway to the garage and then on what appeared to be a pathway to an entry door. He also knocked on that door. Again, there was no answer. During this time he smelled marijuana and looked for evidence of a marijuana growing operation. He observed mildew on the garage entry door, an air treatment apparatus that is inconsistent with use in a garage, but consistent with use in a marijuana grow operation, and potting soil that had been dumped from potlike containers.

The evidence gathered from the PUD and at the residence, as well as additional evidence, was the basis of a search war-

rant that led to the discovery of a marijuana grow operation at 431 Atterbury Road and then another at defendants' residence in Port Townsend.

On July 25, 1991, in connection with the Atterbury Road marijuana grow operation, defendant Mark Maxfield was charged with manufacture of a controlled substance and possession with intent to deliver a controlled substance in Clallam County Superior Court. The following day, in connection with a marijuana grow operation at his residence in Port Townsend, he was charged in Jefferson County Superior Court with possession of a controlled substance (marijuana) with intent to manufacture or deliver. On July 30, 1991, Pamela Maxfield was charged with possession with intent to manufacture or deliver in Jefferson County Superior Court.

All parties agreed to be bound, in both the Clallam County and Jefferson County actions, by the Jefferson County Superior Court ruling on defendants' motion to suppress evidence.

Following a CrR 3.6 hearing, the trial court denied the motion to suppress evidence and entered findings of fact and conclusions of law.

Defendants were then convicted, as charged, upon stipulated facts.

Defendants appealed their convictions and the appeals from both counties were consolidated by the Court of Appeals. This court subsequently accepted certification from the Court of Appeals.

## ISSUES[2]

ISSUE ONE. Are the findings of fact entered in the hearing on the motion to suppress evidence supported by substantial evidence?

ISSUE TWO. Does the voluntary disclosure of information held by a public utility district about a customer violate the public disclosure act or violate the customer's constitutional right to privacy?

---

[2]Defendants failed to specifically set forth any issues pertaining to their 16 assignments of error. *See* RAP 10.3(a)(3); RAP Form 6. Based on defendants' arguments, we conclude the issues to be those set forth herein.

ISSUE THREE. Did the agent investigating the residence located in Sequim substantially and unreasonably depart from the area open to the public and thus violate the privacy rights of defendants?

ISSUE FOUR. Did the trial court err in determining that defendant Mark Maxfield's convictions for manufacturing a controlled substance and for possessing a controlled substance with intent to deliver do not subject him to double jeopardy and, further, do not encompass the same criminal conduct?

## DECISION

ISSUE ONE.

CONCLUSION. The trial court's findings of fact entered following the CrR 3.6 hearing on the motion to suppress evidence are supported by substantial evidence and are therefore verities on appeal.

Defendants assign error to certain of the trial court's findings of fact but do not argue why those findings are alleged to be in error.

█ Where properly challenged, findings entered in a CrR 3.6 hearing are reviewed for substantial evidence.[3] Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.[4] An appellate court will not independently review the evidence. The reason for this is that the trier of fact is in a better position to assess the credibility of witnesses, take evidence, and observe the demeanor of those testifying.[5]

Defendants appear to challenge the trial court's inferences from the testimony and evidence presented at the CrR 3.6 hearing. Specifically, defendants seem to challenge the trial court's failure to agree with defendants' contention that the Drug Task Force officer requested information from a PUD

---

[3]*State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

[4]*Hill*, 123 Wn.2d at 644; *State v. Hagen*, 55 Wn. App. 494, 498, 781 P.2d 892 (1989).

[5]*Hill*, 123 Wn.2d at 646.

employee before filing a written request to inspect the PUD file.

At the hearing, the police officer testified that he was contacted by a PUD employee and was told that the PUD

> had some records that indicated some high power usage that we might be interested in. He asked that I fill out a disclosure form or an information form to obtain these records, at which time I did. I took it over to the PUD, gave it to [the PUD employee] and in turn he gave me the records.

Report of Proceedings vol. 1 (Sept. 20, 1994), at 33-34.

During cross examination, the officer was asked to relate specifically what the officer said and what the PUD employee said during the telephone conversation. The officer testified that he could not recall the details of the conversation but responded to defense counsel's questioning as. follows:

> Q: Well, did [the PUD employee] identify himself?
> A: Yes.
> Q: Did he tell you something to the effect that he had some information you might be interested in?
> A: Yes.
> Q: And did you ask him what it was?
> A: Yes.

Report of Proceedings vol. 1 (Sept. 20, 1994), at 39.

Defendants argue that these responses prove that the officer requested inspection or copying of public utility records over the telephone, rather than in writing.

With regard to this fact and others to which error is assigned, we have reviewed the entire record and conclude that, while other inferences could be drawn from the evidence, the record as a whole contains a sufficient quantity of evidence to persuade a fair-minded and rational person of the truth of the findings challenged. The trial court's findings are therefore binding on appeal.[6]

ISSUE TWO.

CONCLUSION. The voluntary and unsolicited disclosure of power consumption information by a public utility district

---

[6]*Hill*, 123 Wn.2d at 647; *State v. Chaussee*, 72 Wn. App. 704, 708, 866 P.2d 643, *review denied*, 124 Wn.2d 1008 (1994).

employee does not violate the public disclosure act, nor does it infringe on the Fourth Amendment rights of the customer to whom the information pertains.

Defendants appear to argue (1) that the PUD employee involved here violated the public disclosure act (the act), RCW 42.17; (2) that the police violated the act by generally requesting PUD employees to report suspicious activity; (3) that defendants' federal and state constitutional rights to be free from unreasonable searches and seizures and from unlawful invasions of privacy were violated by the PUD employee's disclosure of the information to the police.

The section of the public disclosure act at issue here, RCW 42.17.314, governs a law enforcement officer's inspection or copying of electrical utility records held by a public utility company. That statute provides:

> A law enforcement authority may not request inspection or copying of records of any person, which belong to a public utility district or a municipally owned electrical utility, unless the authority provides the public utility district or municipally owned electrical utility with a written statement in which the authority states that it suspects that the particular person to whom the records pertain has committed a crime and the authority has a reasonable belief that the records could determine or help determine whether the suspicion might be true. Information obtained in violation of this rule is inadmissible in any criminal proceeding.

RCW 42.17.314.

 A request for a search warrant is a criminal proceeding,[7] and evidence obtained in violation of this statute may not be used to obtain a search warrant.

It is helpful in analyzing the above quoted section of the act to begin with a review of its development.

In 1972, the people of this state exercised their direct legislative power by adopting Initiative 276, now codified as the public disclosure act. That act mandates a broad range of disclosure in four areas of government, namely: campaign financing, lobbyist reporting, reporting of elected officials'

---

[7] *State v. Maxwell*, 114 Wn.2d 761, 768, 791 P.2d 223 (1990).

financial affairs, and public records.[8] The case before us involves that portion of the act governing disclosure of public records. This open public records part of the act, contained in RCW 42.17.250-.348, is commonly referred to as the "state freedom of information act".[9]

The state freedom of information act requires broad disclosure of public records, unless specifically exempted from disclosure under the act.[10] The purpose of the act is to provide full access to public records and, while "mindful of the right of individuals to privacy",[11] the act, as initially drafted, contained no general personal privacy right exemption.[12] Furthermore, the act did not contain a definition of a "right to privacy".[13] In *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 580 P.2d 246 (1978), this court interpreted the act to mean that the right to privacy under the state freedom of information act is the right to be free from public disclosure of information that (a) would be highly offensive to a reasonable person and (b) is not of legitimate concern to the public.[14]

In 1986, in *In re Rosier*, 105 Wn.2d 606, 717 P.2d 1353 (1986), this court attempted to "refine" the rule announced in *Hearst Corp. v. Hoppe, supra.*

Rosier examined two requests for public records. Both requests were made to a public utility district in Snohomish County. The first was a request from a political opponent of

[8]For an overview of the act's passage, purpose and effect *see Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 580 P.2d 246 (1978); *In re Rosier*, 105 Wn.2d 606, 618-27, 717 P.2d 1353 (1986) (Andersen, J., dissenting). *See also* Matthew Edwards, Note, *Are Privacy and Public Disclosure Compatible?: The Privacy Exemption to Washington's Freedom of Information Act —* In re Rosier, *105 Wn.2d 606, 717 P.2d 1353 (1986)*, 62 Wash. L. Rev. 257 (1987).

[9]*Progressive Animal Welfare Soc'y v. UW*, 114 Wn.2d 677, 790 P.2d 604 (1990); *In re Rosier*, 105 Wn.2d at 619 (Andersen, J., dissenting).

[10]*See Progressive Animal Welfare Soc'y v. UW*, 125 Wn.2d 243, 251-52, 884 P.2d 592 (1994); *Hearst Corp.*, 90 Wn.2d at 128.

[11]RCW 42.17.010(11).

[12]*In re Rosier*, 105 Wn.2d at 621 (Andersen, J., dissenting).

[13]*Hearst Corp.*, 90 Wn.2d at 135.

[14]*Hearst Corp.*, 90 Wn.2d at 135-36.

the utility district's commissioners and asked for the names and addresses of the utility district's approximately 156,000 customers; the second involved requests for records by police officers. In judicial proceedings following the first request, the trial court enjoined the utility district from releasing the records. The utility district thereafter refused to honor requests from the law enforcement officers for electrical usage records. The parties making the requests appealed.

Rosier made two rulings that changed the complexion of the public disclosure act as it then existed. One, it changed the meaning of "privacy interest" and, two, it restricted police access to electrical usage records.

With regard to the first change, *Rosier* redefined "privacy interest" under the public disclosure act and stated that this court recognized a privacy interest, under the terms of the act, in any information released by an agency (a) which is matched specifically to a particular individual's name and (b) which reveals a unique fact about the individual.[15]

It then applied this new definition of privacy interest to a request by law enforcement for disclosure of electrical usage records of a particular person.[16] In applying its new definition of privacy interest, the court stated that a court must balance the identified privacy interest against the public interest in release of the data. The court recognized that

> [t]he public has a significant interest in disclosure of information leading to arrest for illegal conduct; but the public in general, as well as any particular individual, has a privacy interest in preventing general "fishing expeditions" by governmental authorities.

*In re Rosier*, 105 Wn.2d at 615.

The court further recognized that an individual's privacy interest in power usage records is minimal and that a reasonable person would not be highly offended by its release.[17] Applying its new definition of privacy interest to the facts

---

[15]*In re Rosier*, 105 Wn.2d at 609.

[16]*In re Rosier*, 105 Wn.2d at 614.

[17]*In re Rosier*, 105 Wn.2d at 615.

before it and, in order to prevent general "fishing expeditions" which were not based on an articulable suspicion of criminal conduct, the court stated that it believed law enforcement agencies requesting electrical power usage records should articulate a "specific suspicion of particular illegal conduct, rather than a mere 'reason' for the request, whenever they seek disclosure of particular information matched to a specific individual."[18]

The dissenting opinion in *Rosier* strongly criticized the majority's interpretation of the state freedom of information act. The Legislature agreed with the dissent and, during the 1987 legislative session — the session immediately following the *Rosier* decision — the Legislature effectively overruled *Rosier*[19] by a *unanimous* vote in both the House and the Senate. The legislative finding is unusually specific:

> The legislature intends to restore the law relating to the release of public records largely to that which existed prior to the Washington Supreme Court decision in "In re Rosier," 105 Wn.2d 606 (1986). The intent of this legislation is to make clear that: (1) Absent statutory provisions to the contrary, agencies possessing records should in responding to requests for disclosure not make any distinctions in releasing or not releasing records based upon the identity of the person or agency which requested the records, and (2) agencies having public records should rely only upon statutory exemptions or prohibitions for refusal to provide public records. Further, to avoid unnecessary confusion, "privacy" as used in section 2 of this 1987 act is intended to have the same meaning as the definition given that word by the Supreme Court in "Hearst v. Hoppe," 90 Wn.2d 123, 135 (1978).

Laws of 1987, ch. 403, § 1, p. 1546.

The Legislature thus narrowed the privacy interest protected by the act and nullified the *Rosier* majority's "refining" of the definition of that interest. Defendants' reliance on *Rosier* to support an argument that an individual has a substantial privacy interest in electrical consumption records

---

[18]*In re Rosier*, 105 Wn.2d at 615.

[19]*See Progressive Animal Welfare Soc'y v. UW*, 125 Wn.2d 243, 258-59, 884 P.2d 592 (1994); *Tacoma v. Tacoma News, Inc.*, 65 Wn. App. 140, 148, 827 P.2d 1094, *review denied*, 119 Wn.2d 1020 (1992).

ignores the language of *Rosier* itself, as well as its subsequent abrogation.[20] Accordingly, *Rosier*'s definition of privacy interest as it relates to the public disclosure act is no longer the law in this state.

The Legislature did, however, recognize and accept the *Rosier* majority's concern that the state freedom of information act might be misused by law enforcement as a method for conducting "fishing expeditions" aimed at particular individuals. However, the Legislature did not agree with the court's suggestion that law enforcement officers should articulate a specific suspicion of particular illegal conduct. Instead, the Legislature added what has now been codified as RCW 42.17.314.

That section of the act unambiguously applies when a law enforcement authority requests inspection or copying of a public utility district's electrical usage records of any person.[21] Where inspection or copying of such records is requested, the law enforcement authority must provide the public utility district with a *written* statement which states that the law enforcement authority (1) suspects that the particular person to whom the records pertain has committed a crime and (2) the authority has a reasonable belief that the records could determine or help determine whether the suspicion might be true. No articulation of a specific suspicion of particular illegal conduct is required.

In *State v. Maxwell*, 114 Wn.2d 761, 791 P.2d 223 (1990), we were asked to decide the narrow question whether a law enforcement officer *initiating* a request for records or information, pursuant to RCW 42.17.314, could make that request telephonically. We there construed the provision to require the request for records to be in writing, as the statute clearly requires.

---

[20]*Progressive Animal Welfare Soc'y v. UW*, 125 Wn.2d at 258-59. *But see State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994) (dicta citing *Rosier* and RCW 42.17.314 for the proposition that an individual has a protected privacy interest in power usage records under the public disclosure act, and implying that disclosure of a person's electrical consumption records is prohibited by that act).

[21]RCW 42.17.314.

At issue in the present case are (1) whether this statute prohibits a utility district employee from initiating the contact with police and then voluntarily providing information to law enforcement and (2) whether a general and public request by law enforcement for information related to suspected criminal activity violates this section of the public disclosure act. We answer both questions in the negative.

■ With regard to the first issue, RCW 42.17.314 is clear on its face. The act does *not* govern the conduct of public utility district employees; it governs the conduct of law enforcement authorities.

Again, the act provides:

> A *law enforcement authority may not request* inspection or copying of records of any person, which belong to a public utility district or a municipally owned electrical utility, unless . . .

(Italics ours.) RCW 42.17.314 (part).

The statute does not prohibit a public utility district from disclosing records and we will not read such prohibition into its terms.[22] Particularly in light of the timing of the enactment of this provision, coming within months of the *Rosier* decision and responding to the concerns expressed by the court in *Rosier*, it is clear that the purpose of this statutory provision is to restrict the ability of law enforcement agencies to conduct "fishing expeditions" into the records of particular individuals. The statute did not create a privacy right in those records. To the contrary, it rejected the definition of privacy interest that was urged by the majority opinion in *Rosier*.[23]

*Rosier*, itself, held that an individual's privacy interest in power usage records is minimal and determined that power consumption information was fairly innocuous and would not be highly offensive to reasonable persons.[24] The concern

---

[22]*Progressive Animal Welfare Soc'y v. UW*, 114 Wn.2d 677, 688, 790 P.2d 604 (1990) (in construing statutes, courts may not read into the statutes matters which are not there).

[23]RCW 42.17.255.

[24]*In re Rosier*, 105 Wn.2d 606, 615, 717 P.2d 1353 (1986).

of *Rosier* and the concern of the Legislature was to prevent "general 'fishing expeditions' by governmental authorities."[25] A general fishing expedition would occur when law enforcement agents targeted a particular individual for investigation, without having a reasonable suspicion of criminal activity, and scoured utility district records for evidence of any crime.

General fishing expeditions are not prevented by prohibiting public utility district workers from independently and voluntarily revealing information that they believe creates a suspicion of criminal conduct. If that information does create such a suspicion in the view of law enforcement, then law enforcement may request inspection or copying of the public utility district's records pursuant to RCW 42.17.314.

Here the PUD employee's telephone call to the Drug Task Force, and his disclosure of information about high power usage at a specified address, did not violate the statute and, therefore, is not a ground for suppressing the evidence in the present case.

Defendants additionally contend that by making a general request for help in gathering information regarding drug crimes in Clallam County, the Drug Task Force "requested" the utility district records without complying with the statute. The PUD employee involved here testified that at some time during late 1990 or early 1991, an officer from the Port Angeles Police Department (who was not a member of the Drug Task Force) made a presentation to a general employees' meeting at the PUD. The officer solicited the employees' help in fighting the drug problem. Defendants' argument seems to be that the law enforcement officer violated the statute by orally requesting that employees of the public utility district aid them in the war on drugs by reporting suspicious activity.

■ A general request for help in fighting crime is not a request for inspection or copying of records regarding a particular individual which are held by a public agency.

---

[25]*In re Rosier*, 105 Wn.2d at 615.

Defendants claim that the PUD employee involved here and the Drug Task Force had a "close working relationship" that resulted in the PUD employee acting as an agent of the police. While the record shows that the employee was the contact person designated by his employer to respond to requests made pursuant to RCW 42.17.314 by law enforcement agencies, there is *no* evidence in the record before us that suggests any extension of that minimal relationship between the Drug Task Force and the PUD employee.

There is no indication here that the Drug Task Force attempted to act through a PUD employee in order to avoid the requirements of the statute.

The police involved here did not violate RCW 42.17.314 and the trial court properly ruled that the evidence should not be suppressed on that ground.

■ Defendants next claim that the disclosure of the information about power consumption by the PUD employee violated both state and federal constitutional guaranties. The defendants argue that the rights of privacy are more vigorously protected under the Washington Constitution than under the federal constitution. Whether the Washington Constitution provides a level of protection different from the federal constitution in a given case is determined by reference to the six nonexclusive factors initially established by this court in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).[26] Defendants have failed to analyze the constitutional provisions involved here under the criteria set forth in *Gunwall*. We therefore will not consider independent state constitutional grounds. As we stated in *Gunwall*, "naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion."[27]

Whether an individual customer of a utility company has a privacy interest in electrical consumption records under

---

[26]*Young*, 123 Wn.2d at 179; *State v. Olivas*, 122 Wn.2d 73, 81-82, 856 P.2d 1076 (1993).

[27]*State v. Gunwall*, 106 Wn.2d 54, 62, 720 P.2d 808, 76 A.L.R.4th 517 (1986) (quoting *In re Rosier*, 105 Wn.2d at 616). *See also Olivas*, 122 Wn.2d at 82.

our state constitution is not properly before us in the present case. Resolution of that issue must await another day.

The fourth amendment to the United States Constitution also does not protect an individual from disclosure of public utility records.

The Fourth Amendment provides in part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .

■ In determining whether an unconstitutional search has occurred, we first consider whether defendants had a legitimate expectation of privacy in the information disclosed and whether any such expectation is one which society is willing to recognize as reasonable.[28] A legitimate expectation of privacy is an actual and subjective expectation of privacy in the particular records involved.[29]

■ The United States Supreme Court has concluded that the Fourth Amendment does not prohibit law enforcement from obtaining information without a warrant where the information was initially revealed to a third person, even where the information was revealed in confidence and on the assumption that it would be used only for a limited purpose.[30] Thus, under the Fourth Amendment, there is no legitimate expectation of privacy in bank records[31] or in pen register records of a telephone company showing numbers

---

[28]*Katz v. United States*, 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring); *Young*, 123 Wn.2d at 189.

[29]*Katz*, 389 U.S. at 361 (Harlan, J., concurring).

[30]*See, e.g., United States v. Payner*, 447 U.S. 727, 732, 65 L. Ed. 2d 468, 100 S. Ct. 2439 (1980) (bank customer has no legitimate expectation of privacy in bank records); *Smith v. Maryland*, 442 U.S. 735, 743-44, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979) (telephone user has no legitimate expectation of privacy in telephone pen register showing the numbers dialed).

[31]*See, e.g., United States v. Payner*, 447 U.S. 727, 65 L. Ed. 2d 468, 100 S. Ct. 2439 (1980); *United States v. Miller*, 425 U.S. 435, 442-43, 48 L. Ed. 2d 71, 96 S. Ct. 1619 (1976).

dialed by a particular individual.[32] An individual's expectation of privacy in power consumption records is far less than that expected in bank records and telephone numbers. Unlike telephone and bank records, power records disclose no discrete information about an individual's activities. Furthermore, as we have previously determined, there is but a minimal privacy interest in power records.[33] Such an interest, if it is actual and subjective, is not one that society is willing to recognize as reasonable.[34]

Defendants next argue that the PUD employee involved here violated a policy or procedure of the Clallam County PUD. The "Policies and Procedures for Release of Information and/or Records to the Public Upon Request" state that they were adopted in order to outline the steps employees should take when releasing information or records to the public upon request. The procedures state in part:

> When confidential information is requested from District records about a customer. The Information Officer is responsible for seeing that the person, about which the request is being made, receives, completes, and returns the Waiver Form before the information is released. If the person, about which the request is being made, cannot or will not come in to the office to sign the waiver, the Information Officer must mail the form and wait for it to be returned.

Clerk's Papers, at 132.

The procedures adopted by the PUD do not define "confidential information" and they specifically apply only to

---

[32]*Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979). *See also Gunwall*, 106 Wn.2d at 69 (a legitimate expectation of privacy exists in pen register records under the Washington State Constitution).

[33]*In re Rosier*, 105 Wn.2d at 615.

[34]*See United States v. Porco*, 842 F. Supp. 1393, 1398 (D. Wyo. 1994) (defendants had no legitimate expectation of privacy in power company's records of electrical consumption at their residence); *State v. Kluss*, 125 Idaho 14, 867 P.2d 247 (Ct. App. 1993) (neither Fourth Amendment nor Idaho State Constitution was violated by disclosure of power records), *review denied* (Feb. 17, 1994); *People v. Dunkin*, 888 P.2d 305 (Colo. Ct. App. 1994) (neither the Fourth Amendment nor Colorado State Constitution was violated by disclosure of power records), *cert. denied* Jan. 30, 1995.

*requests* for information. It is not clear from this record when this procedure became effective, whether it was enacted before or after RCW 42.17.314 became law, whether it applies to the kind of information disclosed here, and whether it applies to records requested by police.

These guidelines for employees clearly do not create a federal constitutional right to privacy in PUD records.

ISSUE THREE.

CONCLUSION. The agent investigating the residence located in Sequim did not substantially and unreasonably depart from the area impliedly open to the public and thus did not violate the privacy rights of defendants.

As explained above, after reviewing the PUD records for the residence and garage at 431 Atterbury Road, the Drug Task Force requested a former police officer who was then working as a private investigator to aid them in the investigation.

On June 27, 1991, the investigator went to 431 Atterbury Road to look for evidence of a marijuana grow operation. The residence is located in a rural area. The investigator testified that he drove to the residence on Atterbury, drove in the driveway and noticed another vehicle parked there. He immediately went to the front door. There was no answer to his knock so he walked toward the garage, as he believed he heard someone in the garage. The investigator testified that the overhead door to the garage looked as though it would not open, so he walked on what appeared to be the obvious pathway to the garage entry door. There was no response to his knock on that door either and he then returned to his vehicle. While he was on the property, the investigator smelled growing marijuana and he saw evidence of a marijuana grow operation. This evidence was used to obtain a search warrant.

Defendants claim that the evidence found by the investigator was the result of an unconstitutional search and that it therefore should have been suppressed. We disagree.

It is well settled that when a law enforcement officer or agent is able to detect something by the use of one

or more of his senses while lawfully present at the place where those senses are used, that detection does not constitute a search within the meaning of the Fourth Amendment.[35] The protection of the Fourth Amendment extends to individuals in their "persons, houses, papers, and effects", but that protection is limited to the curtilage. Curtilage is the land immediately surrounding and associated with the home — that area associated with the intimate activity of a home and the privacies of life.[36]

> It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. An officer is permitted the same license to intrude as a reasonably respectful citizen. However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy.

(Footnote and citations omitted.) *State v. Seagull*, 95 Wn.2d 898, 902-03, 632 P.2d 44 (1981).

If a law enforcement officer or agent does not go beyond the area of the residence that is impliedly open to the public, such as the driveway, the walkway, or an access route leading to the residence, no privacy interest is invaded.[37] Whether the intrusion into an area has substantially and unreasonably exceeded the scope of an implied invitation depends on the facts and circumstances of the particular case.[38]

---

[35]*State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981) (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.2, at 240 (1978)).

[36]*State v. Chaussee*, 72 Wn. App. 704, 710, 866 P.2d 643 (no Fourth Amendment violation occurred where law enforcement officer drove eight-tenths of a mile on a private road to defendant's house, knocked on residence door, crossed driveway and knocked on door of shop building before seeing marijuana plants in a garden 50 to 60 feet from the shop building), *review denied*, 124 Wn.2d 1008 (1994).

[37]*State v. Hoke*, 72 Wn. App. 869, 866 P.2d 670 (1994).

[38]*Seagull*, 95 Wn.2d at 903; *Chaussee*, 72 Wn. App. at 708.

The fact that the investigator was there attempting to find evidence of a marijuana grow does not change the rule set forth in *Seagull*.[39]

In *Seagull*, this court recently held that an officer who walked through the yard of a residence from one entrance to another did not intrude upon a constitutionally protected area. In that case the officer did not take the most direct route between the two entrances but, instead, walked down the middle of an open area.

Similarly the investigator involved in the present case testified that he stayed on the pathway, the driveway or the immediate access routes to the house and garage at all times. Defendants' argument that the investigator intruded upon private areas that were not impliedly open to the public is not supported by the record in this case.

ISSUE FOUR.

CONCLUSION. The trial court did not err in determining that defendant Mark Maxfield's convictions for manufacturing a controlled substance and for possessing a controlled substance with intent to deliver do not subject him to double jeopardy and, further, do no not encompass the same criminal conduct.[40]

The stipulated findings of fact state (in part) that: On July 24, 1991, in Clallam County, Washington, law enforcement officers seized 5,200 grams of marijuana found growing in a garage near a house rented by defendant. Defendant Mark Maxfield was paying rent and utilities on the house and the garage. In addition to the marijuana found growing under artificial lights in the garage, officers also found in the house triple beam scales and a quantity of packaged marijuana contained in ziplock bags.

The trial court therefore concluded that the growing marijuana proved that the defendant manufactured marijuana

---

[39]*State v. Petty*, 48 Wn. App. 615, 620, 740 P.2d 879 (an officer's underlying intent or motivation is irrelevant to the judicial inquiry into the lawfulness of the officer's conduct), *review denied*, 109 Wn.2d 1012 (1987).

[40]Unlike the issues discussed above, this issue applies only to defendant Mark Phillip Maxfield.

and that the marijuana bundled up in packages proved that the defendant was possessing marijuana with the intent to deliver.

A judgment was entered against the defendant convicting him of:

Count I

Manufacture of a controlled substance (marijuana) (RCW 69.50.401) and

Count II

Possession of a controlled substance (marijuana) with intent to deliver (RCW 69.50.401).

Clerk's Papers, at 7.

The trial court refused to find the two convictions constituted the "same criminal conduct" for sentencing purposes under RCW 9.94A.400(1)(a).

The defendant argues that convictions for the two crimes violate double jeopardy. He also argues that counts 1 and 2 constitute the "same criminal conduct" for sentencing purposes.

 Double jeopardy protects against both a second prosecution for the same offense after an acquittal or a conviction and also against multiple punishments for the "same offense".[41] The issue here is whether the two crimes charged constitute the "same offense". The test to be applied in the context of double jeopardy challenges to multiple punishments imposed in a single prosecution[42] is commonly referred to as the "same-elements" test or the "*Blockburger*"[43] test.

---

[41]*State v. Laviollette*, 118 Wn.2d 670, 674, 826 P.2d 684 (1992).

[42]In *Laviollette* this court adhered to the rationale of *Grady v. Corbin*, 495 U.S 508, 109 L. Ed. 2d 548, 110 S. Ct. 2084 (1990) which employed a 2-prong test for determining whether the double jeopardy clause of the United States Constitution bars a subsequent prosecution. Since *Laviollette*, the Supreme Court has overruled one prong of the *Grady* test. *United States v. Dixon*, 509 U.S. 688, 125 L. Ed. 2d 556, 573, 113 S. Ct. 2849 (1993). It is not necessary to further discuss the *Dixon* changes here because this case does not involve the issue of subsequent prosecutions but rather multiple punishments for the same offense. *See Laviollette* at 675-76 (discussing the difference between multiple prosecutions and multiple punishments imposed in a single proceeding). Hence the proper test here is the *Blockburger* test long adhered to in Washington.

[43]*Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932).

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*State v. Laviollette*, 118 Wn.2d 670, 675, 826 P.2d 684 (1992) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 2d 306, 52 S. Ct. 180 (1932)). This test focuses primarily on whether or not each offense contains an additional element not included in the other.[44] Count 1 (manufacture) includes the element that the controlled substance be manufactured which includes planting, cultivation, growing, or harvesting.[45] Count 2 includes the element that the defendant possessed the substance with the intent to deliver.[46] Therefore, in this case, each offense contained an element not contained in the other; hence, they are not the "same offense" and double jeopardy is not violated.

The defendant argues that even if the convictions do not constitute double jeopardy, they should be considered to be the "same criminal conduct" for sentencing purposes.

In determining the presumptive sentencing range, other current offenses are used as if they were prior convictions to determine the offender score unless the current offenses encompass the "same criminal conduct". RCW 9.94A.400-(1)(a). That statute provides in relevant part:

whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That *if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. . . . "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.*

(Italics ours.)

---

[44]*State v. Laviollette*, 118 Wn.2d at 675 (citing *State v. Roybal*, 82 Wn.2d 577, 582, 512 P.2d 718 (1973)); *see also United States v. Dixon*, 509 U.S. 688, 125 L. Ed. 2d 556, 568, 113 S. Ct. 2849 (1993).

[45]RCW 69.50.401; RCW 69.50.101(p), (y).

[46]RCW 69.50.401(a); *State v. Sims*, 119 Wn.2d 138, 141, 829 P.2d 1075 (1992).

■ Therefore, to constitute the "same criminal conduct" for purposes of determining an offender score at sentencing, both crimes must involve: (1) the same criminal intent; (2) the same time and place; and (3) the same victim. If any one of these elements is missing, multiple offenses cannot be considered to be the same criminal conduct and they must be counted separately in calculating the offender score.[47] The trial court's determination whether two offenses require the same criminal intent is reviewed by this court for abuse of discretion or misapplication of the law.[48]

In this case, the parties do not dispute that the two crimes were committed at the same time and place and involved the same victim, the public at large.[49] The issue here is whether the defendant had the same criminal intent for the crimes of manufacture and possession with intent to deliver.

■ In our recent case, *State v. Garza-Villarreal*, 123 Wn.2d 42, 864 P.2d 1378 (1993), we reiterated the test set out in *State v. Dunaway*, 109 Wn.2d 207, 215, 743 P.2d 1237, 749 P.2d 160 (1987), to determine if the defendant had the same "criminal intent".

> In deciding if crimes encompassed the same criminal conduct, trial courts should focus on the extent to which the criminal intent, as objectively viewed, changed from one crime to the next. . . . [P]art of this analysis will often include the related issues of whether one crime furthered the other and if the time and place of the two crimes remained the same.

*Garza-Villarreal*, 123 Wn.2d at 46.[50]

In *Garza-Villarreal*, we concluded that the fact that two different drugs were involved in one single transaction in no way indicated different objectives. However in *State v. Burns*, 114 Wn.2d 314, 318-20, 788 P.2d 531 (1990), approved of in

---

[47]*State v. Garza-Villarreal*, 123 Wn.2d 42, 47, 864 P.2d 1378 (1993) (quoting *State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992)).

[48]*State v. Elliott*, 114 Wn.2d 6, 17, 785 P.2d 440, *cert. denied*, 498 U.S. 838 (1990).

[49]*Garza-Villarreal*, 123 Wn.2d at 47.

[50]*See also State v. Collicott*, 118 Wn.2d 649, 669, 827 P.2d 263 (1992) (Durham, J., concurring).

*Garza-Villarreal*, we concluded that the offense of delivery and the offense of possession with intent to deliver were separate crimes for purposes of RCW 9.94A.400(1)(a) under the facts of that case because they involved different criminal intents — an intent to deliver at the present versus an intent to deliver in the future.

Focusing on the extent to which the criminal intent, as objectively[51] viewed, changed from the crime of manufacture of a controlled substance to the crime of possession with intent to deliver, we conclude that the trial court here did not abuse its discretion in concluding these crimes did not constitute the same criminal conduct. In this case, the objective criminal intent is not the same for the two crimes defendant committed; there was a change in the criminal objective.[52] In manufacturing, the objective intent is to produce the drug and the crime is complete without any showing of an intent to deliver.

In this case, there were different "objectives"; one was to grow the drug, the other was to deliver it to third persons.[53] There was evidence in the stipulated findings of fact supporting each offense. The growing marijuana in the garage showed intent (in the past and present) to "manufacture" a controlled substance, whereas the marijuana found in the house in plastic baggies showed the defendant's intent to deliver the drugs in the future.[54] Hence, the trial court did not abuse its discretion in refusing to treat the two crimes as the "same criminal conduct" for sentencing purposes.

■ Defendant Mark Maxfield assigns error to the Clallam County trial court's order holding him in contempt for refus-

---

[51]*See State v. Collicott*, 112 Wn.2d 399, 414, 771 P.2d 1137 (1989) (Durham, J., dissenting).

[52]*See State v. Burns*, 114 Wn.2d 314, 318, 788 P.2d 531 (1990).

[53]*See State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992) (objectively viewed, defendant's criminal intent changed when he moved from the burglary to the kidnapping; the former did not further the latter).

[54]*See Burns*, 114 Wn.2d at 318 (possession of cocaine after the sale of cocaine to one party manifested a separate instance of criminal intent to deliver cocaine in the future).

ing to state his name to the trial court at the time of ar-
raignment. Defendant fails to provide any applicable au-
thority for his position that the trial court's demand to
reveal his name violated his constitutional rights. We will
not address constitutional arguments unsupported by ade-
quate briefing.[55]

To summarize: Neither the state freedom of information
act nor the fourth amendment to the United States Consti-
tution prohibits a public utility district employee from inde-
pendently and voluntarily disclosing information regarding
a customer's power consumption. Further, a police officer's
general request for help in fighting crime does not constitute
a request for information or records of a particular person
under RCW 42.17.314. The law enforcement authority here
did not violate defendants' constitutional rights to privacy
by walking in an area near a residence rented by defendant
Mark Maxfield where that area was impliedly open to the
public. Defendant Mark Maxfield's conviction and sentence
did not violate the double jeopardy clause of the constitution
and his sentence for two separate offenses based on the Clal-
lam County convictions did not violate the statutory prohi-
bition against sentencing separately for the same criminal
conduct.

Affirmed.

BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ.,
concur.

JOHNSON, J. (dissenting) — Misinterpreting RCW 42.17.314,
the majority permits the very activity the statute was ex-
pressly designed to prohibit. The records here were released
without prior statutory compliance. The evidence suggests
law enforcement authorities circumvented the statutory re-
quirements by suggesting to public utility district (PUD) of-
ficials that they turn over specific information. Under the
majority's approach, PUD officials could eviscerate the statu-
tory procedures and turn over all protected records by "volun-

---

[55]*State v. Hill*, 123 Wn.2d 641, 648, 870 P.2d 313 (1994).

tarily" sending law enforcement officials a monthly "print-out" or "evaluation". This is patently absurd and offends, at the very least, statutory requirements.

I agree with the majority that the Legislature designed RCW 42.17.314[56] to prohibit "general 'fishing expeditions' " by government authorities. Majority, at 393. As the majority correctly notes, a general fishing expedition occurs when law enforcement officials target a particular person for investigation and search utility records "without having a reasonable suspicion of criminal activity". Majority, at 393. However, by misapplying RCW 42.17.314 to the facts here, the majority does away with this statute's core requirement of a reasonable suspicion of criminal activity *before* the records are disclosed.

RCW 42.17.314 imposes three distinct requirements on law enforcement authorities seeking access to public utility district customer records. First, the authority must suspect that "the particular person to whom the records pertain has committed a crime". Second, the authority must have "a reasonable belief that the records could determine or help determine whether the suspicion might be true". Third, the authority must provide the public utility district with a "written statement" setting forth its suspicion and belief. Only *after* these three requirements have been met may the public utility district allow a law enforcement authority to inspect or obtain copies of customer records. RCW 42.17.314 is explicit and clear: if these requirements are not satisfied, the information obtained is inadmissible in any criminal proceeding.

---

[56]RCW 42.17.314 reads as follows:

"A law enforcement authority may not request inspection or copying of records of any person, which belong to a public utility district or a municipally owned electrical utility, unless the authority provides the public utility district or municipally owned electrical utility with a written statement in which the authority states that it suspects that the particular person to whom the records pertain has committed a crime and the authority has a reasonable belief that the records could determine or help determine whether the suspicion might be true. Information obtained in violation of this rule is inadmissible in any criminal proceeding."

The majority argues law enforcement authorities are not required to articulate a specific suspicion of particular illegal conduct. Majority, at 391. While this statement is true, it does not address the issue at hand. The question is whether RCW 42.17.314 requires a law enforcement authority to submit a written statement setting forth the statutorily required suspicion and belief *before* it may receive information contained in customer records maintained by a public utility district. The statute clearly requires such a written statement *before* the records can be divulged.

In this case there was no written statement before statutorily protected information was divulged to a law enforcement authority. Indeed, there is no indication the Clallam County Drug Task Force had any prior suspicion the Maxfields had committed a crime. The record establishes without question that the PUD official, an employee, treasurer, and comptroller of the Clallam County Public Utility District (PUD), had an arrangement with the Drug Task Force to provide them with information. Information as to "suspicious activities" was regularly turned over to law enforcement authorities. Undoubtedly, this information was provided because the Drug Task Force had told the PUD employee the type of activity for him to report.

The majority's discussion of *In re Rosier*, 105 Wn.2d 606, 717 P.2d 1353 (1986) and the subsequent amendment to RCW 42.17.314 does not resolve the question presented here. Rather, the answer is provided specifically and explicitly by the statute, which recognizes a privacy interest in public utility records that cannot be infringed upon without statutory compliance. That privacy interest is held by the PUD's customers, not the PUD. It makes little legal difference whether police directly or indirectly solicit PUD records in contravention of the statute.

RCW 42.17.314 does not prevent law enforcement personnel from receiving information from public utility district employees who observe suspicious activities. Law enforcement authorities are prevented, however, from conducting fishing expeditions in PUD records. A law enforcement

authority may not circumvent the protections in RCW 42.17.314 by arranging for other government employees to conduct fishing expeditions *on its behalf*. Such an arrangement need not be formal or well organized to contravene RCW 42.17.314; all that is required is an arrangement initiated or approved of by law enforcement authorities whereby they predictably receive confidential information without having first to comply with the requirements in RCW 42.17.314. Because the PUD employee and the Drug Task Force had such an arrangement, I dissent. The evidence resulting from this violation of RCW 42.17.314 should have been suppressed.

UTTER and MADSEN, JJ., concur with JOHNSON, J.

Reconsideration denied February 1, 1995.