# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53331-6-II |
| Respondent, | |
| v. | |
| TERESA JUNE YORK, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Teresa York appeals her conviction and sentence for possession of a controlled substance (methamphetamine) that was discovered on her person following a *Terry*[1] detention. She argues that the trial court erred when it denied her CrR 3.6 motion to suppress the evidence because the officer lacked reasonable suspicion to detain her, and that the scope of the detention exceeded its investigatory purposes.

We hold that the trial court properly denied York's CrR 3.6 motion because the officer had reasonable suspicion that York was engaged in criminal activity. We decline to address York's claim regarding the scope of the seizure because she did not raise this issue before the trial court.

Accordingly, we affirm.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

FACTS

At approximately 1:30 a.m., Officer Christopher O'Neill Roberts was on patrol in a neighborhood that he had patrolled many times before in his 12 years working for the Fircrest Police Department. The area was residential and did not contain any businesses.

Roberts noticed a Cadillac stopped on the wrong side of the road, facing south in a northbound lane, with its headlights illuminated and its engine running. The Cadillac was blocking the roadway such that someone driving along that road would have to travel into the opposite lane of traffic to avoid the vehicle. A Suzuki was parked on the side of the road about 30 feet away from Cadillac, facing the opposite direction. The two cars were not aligned hood to hood, "or even left headlight to left headlight, the way that two vehicles would be if individuals were attempting to jump start a vehicle." Clerk's Papers (CP) at 42. The Suzuki's headlights were also on, but its engine was not running.

Due to the position of the two cars and the late hour, Roberts immediately became concerned that a car prowl was in progress, as was common for that area and that time of day. When Roberts pulled up in his marked patrol car, Todd Hanson, "quickly" exited the driver's side of the Suzuki and walked to the passenger side of the Cadillac. 1 Verbatim Report of Proceedings (VRP) at 12. Hanson attempted to enter the passenger side of the Cadillac "hurriedly," but the door was locked. *Id.* York was sitting in the driver's seat.

Roberts believed, based on his observations and prior experience, that Hanson was prowling vehicles and that York was waiting in the Cadillac to act as a getaway driver. Roberts had investigated vehicle prowls in the past, and it was "[n]ot uncommon" for two people to act together in this manner. *Id.* at 17. Hanson did not appear to possess a theft tool, and Roberts did

not identify any signs of forced entry on either car, but a majority of car prowls in that area involved cars that were inadvertently left unlocked.

Upon exiting his patrol vehicle, Roberts trained his spotlight on the general area of the Cadillac. Roberts then looked towards York in the Cadillac and asked her to place her hands in her lap, and she complied. York and Hanson both stated that the Suzuki stopped in that location earlier in the day and that they returned to jumpstart the car. Roberts believed that the vehicles were not positioned in a manner consistent with this explanation.

After York provided a verbal identification, Roberts ran a search on York's name and discovered that York had an active warrant for her arrest for third degree theft. York was arrested on that warrant.

In a search incident to arrest during booking, the booking officer discovered methamphetamine on York's person. York was subsequently charged with one count of unlawful possession of a controlled substance.

Arguing that her seizure was unlawful because Roberts lacked reasonable suspicion sufficient to justify the detention, York moved to suppress the methamphetamine evidence obtained following her arrest. York did not argue that the detention itself was excessive in scope, either in her briefing submitted to the trial court or during the suppression hearing.

During the CrR 3.6 hearing, Roberts testified consistently with the facts as stated above. The trial court found Roberts's testimony credible. No other witnesses testified at the suppression hearing. The trial court denied York's motion to suppress and entered written findings of facts and conclusions of law memorializing its ruling.

Following the trial court's denial of her motion to suppress, York waived her right to a jury trial and the case proceeded to a bench trial. The trial court found York guilty and sentenced her to 30 days confinement and 12 months community custody.

STANDARD OF REVIEW

When reviewing a trial court's decision to deny a motion to suppress, we review the conclusions of law de novo and the findings of facts supporting those conclusions for substantial evidence. *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017). Our review of the trial court's factual findings is limited to those "'to which error has been assigned.'" *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003) (internal quotation marks omitted) (quoting *State v. Kinzy*, 141 Wn.2d 373, 382, 5 P.3d 668 (2000)). Unchallenged findings are verities on appeal. *State v. Betancourth*, 190 Wn.2d 357, 363, 413 P.3d 566 (2018). York does not raise a challenge to any of the trial court's findings.

DISCUSSION

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, an officer may not seize a person without a warrant unless a carefully drawn exception to the warrant requirement applies. *Weyand*, 188 Wn.2d at 811.[2] A *Terry* detention constitutes one such exception. *Id.*

Under *Terry*, an officer may briefly detain a person for questioning without a warrant "if the officer has reasonable suspicion that the person is or is about to be engaged in criminal activity." *Id.* Reasonable suspicion of criminal activity must be "'based on specific and articulable

---

[2] The State conceded both below and on appeal that York was seized when Roberts shined his spotlight on York's car and asked her to keep her hands in her lap.

facts known to the officer at the inception of the stop.'" *Id.* (quoting *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015)). And it must be individualized to the person subject to the detention. *Id.* at 812.

We consider the totality of the circumstances known to the officer in evaluating the reasonableness of the officer's suspicion. *Id.* at 811. "'The totality of circumstances includes the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty.'" *Id.* at 811-12 (quoting *Fuentes*, 183 Wn.2d at 158). In addition, a valid *Terry* stop must be "limited in scope and duration to fulfilling the investigative purpose of the stop." *Acrey*, 148 Wn.2d at 747.

## I. REASONABLE JUSTIFICATION FOR THE DETENTION

York challenges the adequacy of Officer Roberts's justification detaining her, asserting that her conduct was innocuous and, thus, the officer lacked reasonable suspicion that she was engaged in criminal activity. We disagree with York and conclude that under the totality of the circumstances, Officer Roberts had a reasonable suspicion that York was engaged in criminal activity.

York does not assign error to any of the trial court's findings of fact. Rather, York contends that the facts show that Hanson did nothing to warrant suspicion while parked illegally in his car, that Hanson was not in possession of burglary tools or stolen property, that there were no reports of vehicle prowls in the area, and there was no sign of forced entry into either Hanson's or York's vehicles. Further, York contends neither she nor Hanson made any furtive movements, and the answer they gave about what they were doing was plausible. Thus, she argues, the totality the

circumstances did not support a reasonable suspicion that she was engaged in criminal activity with Hanson.

York asserts that her case is analogous to *State v. Larson*, 93 Wn.2d 638, 645, 611 P.2d 771 (1980), in which the Supreme Court held that the investigatory detention was unlawful under the Fourth Amendment and under article 1, section 7. There, a car was parked illegally in a high-crime neighborhood late at night and pulled away as the officers approached. *Larson*, 93 Wn.2d at 641. Officers stopped the vehicle and requested identification from Larson, who was a passenger. *Id.* The Supreme Court held that while the officer's investigation of the driver could arguably be justified based on the parking violation, the officer lacked justification to investigate Larson because the officer had no individualized suspicion that Larson had engaged in unlawful activity. *Id.*

*Larson* is inapposite. In *Larson*, the court's holding focused on the officer's ability to investigate a passenger based on suspicion related solely to the driver. *Id.* Here, York was the driver of a car that was stopped while facing south in a northbound lane in a position that would have required any northbound travelers to maneuver around her. Unlike the passenger in *Larson*, York's own actions aroused Roberts's suspicions.

York also relies on *State v. Fuentes*. *Fuentes* involved two consolidated cases, *Sandoz* and *Fuentes*. 183 Wn.2d at 159-64. In *Sandoz*, the case York relies on, the officer was patrolling an apartment complex that he observed regularly due to its high frequency of criminal activity. *Id.* at 153. The officer watched Sandoz exit the apartment of a woman whom the officer knew to have a prior conviction for possession of a controlled substance with intent to deliver. *Id.* at 154. The officer observed that when Sandoz saw him, Sandoz's eyes grew large, Sandoz was shaking

6

visibly, and Sandoz's face looked pale and thin. *Id.* The court held that these facts were insufficient to warrant detention of Sandoz under *Terry* and suppressed the evidence. *Id.* at 160-61.

York contends that the facts in *Sandoz* were arguably more suspicious than those involved in her own case because unlike Sandoz, she was not observed making any furtive movements and she was seen while stopped on a public street, rather than exiting a "known drug house." Br. of Appellant at 10.

We disagree with York's minimization of her conduct. In *Fuentes*, the officer who stopped Sandoz conceded that the circumstances were generally "'suspicious,'" but amounted to no more than a "hunch" that Sandoz was involved in criminal or drug-related activity. 183 Wn.2d at 161. York, in contrast, was not merely stopped on a public street, as she suggests. Rather, York was in a residential neighborhood late at night in the driver's seat of a car stopped in the road facing the opposite direction of oncoming traffic. York's position 30 feet from the Suzuki rendered it unlikely that she was there to assist the car with a jumpstart or repair. If a repair or jumpstart were taking place, York's Cadillac would likely be flush with the Suzuki as opposed to misaligned and stopped in the roadway.

Further, Roberts had 12 years of experience patrolling that particular area and knew that car prowls occur with regular frequency in that neighborhood at that time of night. It is also not uncommon for two individuals to work together in executing a car prowl, and Roberts observed that York's car was situated in a manner that would make for a quick escape if needed. The totality of the circumstances demonstrate that Roberts had a reasonable suspicion that York was engaged in an ongoing car prowl.

The trial court properly concluded that the detention was lawful, and thus correctly denied York's CrR 3.6 motion to suppress the evidence discovered following the detention. In particular, the unchallenged factual findings reflect that Roberts had sufficient reasonable suspicion to warrant the detention based on York's own conduct, the location and hour in which Roberts came across her, and Roberts' training and experience.

## II. SCOPE AND DURATION OF THE DETENTION

York argues that the detention was excessive in scope and duration because Roberts continued to detain her although Roberts did not observe theft tools, signs of forced entry, or contraband. In addition, York contends that the detention was overly intrusive because she was required to remain in her car with her hands in her lap during a "period of awkward silence," while Roberts trained his spotlight on her. Br. of Appellant at 12. Finally, York asserts that the duration of the detention was excessive.

We decline to address the merits of this claim because York did not raise these arguments below and did not ask the trial court to suppress evidence based on her current claim that the detention exceeded its lawful scope and duration. Rather, York focused exclusively on whether the detention was justified at its inception. As a result, the record was not developed with a view toward resolving this issue. The trial court did not make any factual findings pertaining to the scope of the seizure, such as the length of York's detention, the reasons for any delay, or the nature of Roberts's interactions with York during her detention. Likewise, the trial court did not make any legal conclusions about whether the detention was excessive in scope or duration.

Whether the scope of the detention was excessive is a separate issue from whether the detention was justified at its inception. *See State v. Williams*, 102 Wn.2d 733, 739, 689 P.2d 1065

8

(1984) (identifying the justification for the detention and the scope of the detention as two separate inquiries a court must make in evaluating the lawfulness of investigative detentions). And we do not "hold full evidentiary hearings or have the power to independently review evidence to develop answers to previously unraised suppression theories." *State v. Cross*, 156 Wn. App. 568, 578 n.8, 234 P.3d 288 (2010). In the context of a suppression hearing, "[a]n appellate court will not independently review the evidence." *State v. Maxfield*, 125 Wn.2d 378, 385, 886 P.2d 123 (1994). To address this issue for the first time on appeal, we would have to act as fact finder and decide an issue that the trial court never ruled on. Moreover, without a trial court ruling on this issue, there is nothing for us to review. *See Cross*, 156 Wn. App. at 578. We thus decline to address York's contentions regarding the scope and duration of the seizure.

CONCLUSION

The trial court properly denied York's CrR 3.6 motion to suppress the methamphetamine discovered on her person following her arrest because York's detention was supported by

reasonable suspicion of criminal activity. We therefore affirm the trial court's denial of York's CrR 3.6 motion to suppress.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

GLASGOW, J.