IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31543-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HERBERT ELMER ELLSWORTH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Police discovered a marijuana grow operation and a plethora of controlled substances in the home of Herbert Ellsworth after police entered the home upon Ellsworth's girl friend calling 911. Ellsworth challenges his many convictions by asserting his trial counsel failed to provide effective assistance of counsel when failing to move to suppress the evidence of controlled substances. Ellsworth also challenges his sentence on numerous other grounds. We affirm Herbert Ellsworth's convictions and sentence.

## FACTS

Herbert Ellsworth cohabitated with his girl friend Monica Cooper beginning in February 2011. On February 4, 2012, Ellsworth pushed Cooper twice following an argument about "the dishes or the hot water heater or something like that." Report of Proceedings (RP) at 104-05. Ellsworth pushed Cooper in the kitchen, from behind,

toward rolling chairs. Ellsworth exited their home, threatening to retrieve his family from next door. Cooper called emergency services, but hung up. Emergency services called Cooper back. Monica Cooper "told them not to come." RP at 159.

Monica Cooper testified at trial:

> Q. What did you do after the defendant told you that he was going to go get his family?
> A. I called the stupid cops.
> Q. Okay. And why did you do that?
> A. Because I don't want anybody to tell me what I'm going to do and not do in my home. I paid my rent and it was my place and if I don't want somebody to be around me, I should have that right. And I'm stubborn and I think I should—I should have just let it go.
> Q. So you're upset that you called the cops after you were assaulted?
> A. Yes. I lost everything.

RP at 109.

Emergency dispatch reported to law enforcement "a physical domestic in progress." RP at 334. Within 60 to 90 seconds, Moses Lake Police Officer Kevin Hake arrived at the home. Jackie Cooper, Monica Cooper's mother, arrived at the home about the same time and proceeded into the home.

Monica Cooper further testified at trial:

> Q. Okay. When—did the police arrive?
> A. When did they arrive?
> Q. No. Did they arrive?
> A. Yeah, they did.
> Q. Okay.
> A. They walked right in my house.

2

Q. Okay. Did you—when the police arrived, did you know exactly where the defendant was?

A. Yes. I told them that he was not—they asked me if he was there and I said no, he took off, and I went like that.

Q. You need to describe what—for the record, you went like what? We need to describe that.

A. Like this. He took off. Because the front door was right there and I was standing outside my bedroom and you just go around the corner and you can see the door and I said he took off that way.

Q. So—

THE COURT: For the record, the witness is pointing out.

RP at 109-10.

Officer Hake later testified:

I had yelled for Jackie [Monica Cooper's mother] to stop. She didn't and went through the screen door. So as I got to the door, I announced, Moses Lake Police Department, Monica, can I talk to you, and she was screaming that somebody had beat her up.

. . . .

After I had asked her to come, she turned towards the bedroom, I again announced, Moses Lake Police Department, Monica, I need to speak with you. And she headed to the bedroom with Jackie between herself and the front door where I was. And that's when I again repeated it and went in.

. . . .

She had originally made a statement when I was outside that he had beat her up, and then when I went inside—

. . . .

After I entered the home, and she was back by the bedroom, I was talking to her quickly trying to get information, Monica, is he still in here? What happened? She used the word Herbie or the name Herbie, she said Herbie beat her up and she's not sure where he was at.

. . . .

[Monica] was still crying, moving around quickly, speaking very quickly. She was kind of evasive where she wanted to—appeared to get away, like she was scared.

. . . .

3

Monica had made statements that she wasn't sure if—if Herbie was still in the residence. So my concern was locating any unknown threats, any persons hiding.

RP at 335-39.

Jackie Cooper escorted her daughter Monica outside to the home's front porch. Officer Kevin Hake remained inside to perform "a protective sweep of the immediate known area." RP at 339.

Moses Lake Police Officer Kevin Hake "cleared" the kitchen and living room, searching for Herbert Ellsworth. RP at 339. Hake continued down a hallway. Officer Hake smelled marijuana. In the first bedroom, Hake found large lamps and marijuana plants. At trial, witnesses referred to this room as the "purple room," referring to the color of its walls. The next room down the hallway was Ellsworth's bedroom; it was locked. Officer Hake "was still concerned about unknown threat behind the door. I advised over the radio that I had a locked door, I was waiting for another unit, and asked for the third unit to go to the back of the residence." RP at 342. Corporal Thomas Tufte soon arrived. Hake and Tufte opened the locked door to enter Ellsworth's bedroom. They found no one.

The Moses Lake police officers obtained and executed a telephonic warrant to search the home. In the purple room, police found lights for growing plants indoors, "Monster Grow" fertilizer, a box containing Herbert Ellsworth's tax documents, and 30 marijuana plants. In Ellsworth's bedroom, police confiscated a scale, multiple sandwich

4

bags containing 3 to 4 grams of marijuana each, a sift, a pipe, a jar with 20 grams of marijuana, and a metal tin containing burnt marijuana. Police also discovered in Ellsworth's room: 6 small jeweler baggies, some of which tested positive for methamphetamine; a cigar box, which contained an expired concealed pistol license and debit card bearing Herbert Ellsworth's name; a pistol and ammunition; and a whiteboard with two columns, one titled "5" and the other "20," under the larger heading of "Bills!!!" Corporal Thomas Tufte testified at trial:

> Q. Based on your training, education and experience, do the figures on that white board have any significance in relation to—to your knowledge of drug activity?
> A. Yes.
> Q. And what is that significance?
> A. In marijuana, in particular, and most drugs that are sold, they are weighed and measured into quantities and normally those quantities are based on a dollar amount of value that they tend to get for the drugs when they sell them. Basically, common amounts are fives, tens, 20s, they don't want to have to break bills when they're doing transactions, so they'll give a $5 amount in a bag, they'll do a $20 amount in a bag, a $10 amount in a bag, and that's your normal quantities.

RP at 570.

## PROCEDURE

The State of Washington charged Herbert Ellsworth with: (1) manufacturing marijuana in violation of RCW 69.50.401(1), 69.50.401(2)(c), and 69.50.204(c)(14); (2) possession of marijuana with the intent to manufacture or deliver in violation of RCW 69.50.401(1), 69.50.401(2)(c), and 69.50.204(c)(14); (3) possession of methamphetamine

in violation of RCW 69.50.4013 and 69.50.206(d)(2); (4) assault in the fourth degree in violation of RCW 9A.36.041 with a sentence enhancement for domestic violence in violation of RCW 10.99.020; and (5) use of drug paraphernalia in violation of RCW 69.50.412(1). The trial lasted four days.

During its closing statement, the State of Washington distinguished count I from count II. To support its charge of count I of manufacturing marijuana, the State pointed only to evidence found in the purple room. To support its charge of possession of marijuana with the intent to manufacture or deliver, the State pointed only to evidence found in Herbert Ellsworth's room. The State summarized, "The defendant in this matter is charged with manufacture of marijuana, the purple grow room, possession with intent to deliver marijuana, that marijuana and those pieces of accoutrement, paraphernalia, if you will, that were on his dresser in his closet." RP at 685.

The trial court instructed the jury concerning count I—manufacturing of marijuana:

> To convict the defendant of the crime of manufacture of a controlled substance as charged in count one, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about February 4, 2012, the defendant manufactured a controlled substance;
> (2) That the defendant knew that the substance manufactured was marijuana; and
> (3) That the acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

6

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

. . . .

The defendant is charged in count one with manufacture of marijuana. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of possession of marijuana, more than 40 grams.

Clerk's Papers (CP) at 215, 218.

The trial court instructed the jury concerning count II—possession of marijuana with intent to deliver or manufacture:

To convict the defendant of the crime of possession with intent to deliver marijuana as charged in count two, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about February 4, 2012, the defendant possessed marijuana;
(2) That the defendant possessed the substance with the intent to deliver marijuana; and
(3) That the acts occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

. . . .

The defendant is charged in count two with possession with intent to deliver marijuana. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of possession of marijuana, less than 40 grams.

CP at 221, 223. The jury found Herbert Ellsworth guilty on all counts.

7

In a victim impact statement for purposes of sentencing, Monica Cooper wrote, "I'm asking for . . . Restitution for suffering . . . [and] Restitution for things he Stole & destroyed in the fight." CP at 251. During the sentencing hearing, the trial court imposed a total of $1,450 in legal financial obligations (LFOs), but lined out $2,094.09 restitution to Monica Cooper. The court indicated, "[x] The above total does not include all restitution or other legal financial obligations, which may be set by later order of the court. An agreed restitution order may be entered. RCW 9.94A.753. A restitution hearing [x] shall be set by the prosecutor." CP at 259. At the sentencing hearing, the State agreed to set a later hearing to determine restitution. The appellate record contains no record of a restitution hearing or restitution order. The trial court's judgment and sentence shows restitution of $2,094.09 for Monica Cooper but the figure is lined out as "~~$2,094.09~~."

The trial court calculated Herbert Ellsworth's offender score as two for counts I through III. The trial court ordered four months' confinement for counts I through III to run concurrently to each other, but consecutively to count IV. The court said, "I'll follow the State's recommendation—four months on Counts I, II and III. Those run by operation of law concurrently." RP (Mar. 26, 2013) at 52.

The trial court ordered 300 days' confinement for count IV, with 270 of those days conditionally suspended for two years. The trial court ordered zero days' confinement

for count V, accepting the State's concession that count V is double jeopardy to counts I through III.

## LAW AND ANALYSIS

On appeal, Herbert Ellsworth contends that he did not receive the effective assistance of counsel because defense counsel (1) failed to request a CrR 3.6 hearing to suppress the State's evidence, (2) failed to challenge restitution, (3) failed to argue double jeopardy, and (4) failed to argue same criminal conduct. Ellsworth additionally raises his restitution, double jeopardy, and same criminal conduct claims independent of counsel's effectiveness. We agree to directly address his restitution, double jeopardy, and same criminal conduct arguments. We will review his suppression of evidence assignment of error only through the filter of his claim of ineffective assistance of counsel.

*Ineffective Assistance and Motion to Suppress*

Herbert Ellsworth contends that he did not receive the effective assistance of counsel because his defense counsel did not move to suppress the drug-related evidence as the fruit of an unconstitutional search. A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). This court presumes that counsel was effective. *Strickland v. Washington*,

9

466 U.S. 668, 689-90, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To rebut the strong presumption that counsel's performance was effective, the defendant bears the burden of establishing the absence of any conceivable legitimate tactic explaining counsel's performance. *State v. Hamilton*, 179 Wn. App. 870, 879-80, 320 P.3d 142 (2014).

We decline to address whether Herbert Ellsworth's trial counsel violated the standard of care, because we can decide the appeal based upon the failure to show prejudice. If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). Prejudice occurs when, but for the deficient performance, the outcome would have differed. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998); *McFarland*, 127 Wn.2d at 337. In order to establish actual prejudice, Ellsworth must show that the trial court likely would have granted a motion to suppress the seized evidence based on an unlawful warrantless search of the home. *Hamilton*, 179 Wn. App. at 882. We believe otherwise.

Article I, section 7 of the Washington State Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under the Washington State Constitution, the home receives heightened constitutional protection. *State v. Kull*, 155 Wn.2d 80, 84, 118 P.3d 307 (2005). For this reason, the closer officers come to intrusion into a dwelling, the greater the constitutional protection. *State v. Ferrier*, 136 Wn.2d 103, 112, 960 P.2d 927 (1998). The heightened protection

10

afforded state citizens against unlawful intrusion into private dwellings places an onerous burden upon the government to show a compelling need to act outside of our warrant requirement. *State v. Chrisman*, 100 Wn.2d 814, 822, 676 P.2d 419 (1984).

Moses Lake Officers Thomas Tufte and Kevin Hake obtained a search warrant, but both entered the house and discovered evidence of a crime before obtaining the warrant. Thus, we analyze the appeal based upon information gained by the officers before issuance of the warrant.

As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Washington allows a few jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and *Terry* investigative stops. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). On appeal, the State relies on the emergency aid exception, as a form of exigent circumstances. *State v. Schultz*, 170 Wn.2d 746, 754-55, 248 P.3d 484 (2011).

The emergency aid exception emerges from the police's community caretaking function and allows for the limited invasion of constitutionally protected privacy rights

11

when it is necessary for police officers to render aid or assistance. *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004); *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000). Our Supreme Court adopted a six factor test for the emergency aid exception in *State v. Schultz*:

> Under this court's cases, to justify intrusion under the emergency aid exception, the government must show that (1) the officer subjectively believed that someone likely needed assistance for health or safety concerns; (2) a reasonable person in the same situation would similarly believe that there was need for assistance; . . . (3) there was a reasonable basis to associate the need for assistance with the place being searched. (4) there is an imminent threat of substantial injury to persons or property, (5) state agents must believe a specific person or persons or property is in need of immediate help for health or safety reasons, and (6) the claimed emergency is not a mere pretext for an evidentiary search.

170 Wn.2d at 746 (citation omitted) (internal quotation marks omitted) (quoting *Kinzy*, 141 Wn.2d at 386-87).

Officers Hake and Tufte entered the quintessential volatile situation of domestic violence. Domestic violence holds distinct problems because a battered woman often recants complaints of violence in order to protect a boyfriend or husband, only to return to more violence. For this and other reasons, a Washington statute compels a law enforcement officer to arrest anyone engaged in domestic violence. RCW 10.31.100(2) provides:

> A police officer *shall* arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that:
>
> . . . .

12

(c) The person is sixteen years or older and within the preceding four hours has assaulted a family or household member as defined in RCW 10.99.020 and the officer believes: (i) A felonious assault has occurred; (ii) an assault has occurred which has resulted in bodily injury to the victim, whether the injury is observable by the responding officer or not; or (iii) that any physical action has occurred which was intended to cause another person reasonably to fear imminent serious bodily injury or death. Bodily injury means physical pain, illness, or an impairment of physical condition. When the officer has probable cause to believe that family or household members have assaulted each other, the officer is not required to arrest both persons. The officer shall arrest the person whom the officer believes to be the primary physical aggressor. In making this determination, the officer shall make every reasonable effort to consider: (i) The intent to protect victims of domestic violence under RCW 10.99.010; (ii) the comparative extent of injuries inflicted or serious threats creating fear of physical injury; and (iii) the history of domestic violence of each person involved, including whether the conduct was part of an ongoing pattern of abuse.

(Emphasis added.)

*State v. Schultz* also entailed domestic violence. Our high court further held:

[T]he fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury.

170 Wn.2d at 756. The *Schultz* court further wrote:

Domestic violence presents unique challenges for law enforcement. Domestic violence situations can be volatile and quickly escalate into significant injury. Domestic violence often, if not usually, occurs within the privacy of a home. Our legislature has recognized that the risk of repeated and escalating acts of violence is greater in the domestic context. RCW 10.99.040(2)(a). The legislature has sought to provide "maximum protection" to victims of domestic violence through a policy of early intervention. RCW 10.99.010. The Court of Appeals has recognized that "[p]olice officers responding to a domestic violence report have a duty to

13

ensure the present and continued safety and well-being of the occupants."
[*State v.*] *Raines*, 55 Wn. App. [459,] 465[, 778 P.2d 538 (1989)].

*Schultz*, 170 Wn.2d at 755.

Officer Kevin Hake subjectively and reasonably believed that someone in the home might be in need of immediate assistance. As Hake arrived, Jackie Cooper ran into the home, Monica Cooper cried, and Monica appeared frightened. Dispatch had reported "a physical domestic in progress." RP at 334. As noted in *Schultz*, "[d]omestic violence situations can be volatile and quickly escalate into significant injury." 170 Wn.2d at 755. Under the circumstances, Officer Hake was justified in entering the home to assist Monica Cooper.

Concluding that Moses Lake Officer Hake had the right to enter the home does not end our inquiry. We must further ask whether Hake could remain in the home and search for Herbert Ellsworth, thereby coming upon the evidence of marijuana.

The testimony of Monica Cooper conflicted with that of Officer Kevin Hake as to whether Herbert Ellsworth could be found in the home. Monica Cooper testified that when Officer Hake arrived in the house, she told the officer that Ellsworth fled the home. Officer Kevin Hake testified that Cooper was crying, scared, and evasive and stated that "Herbie" beat her up and she did not know "where he was." RP at 338.

If Herbert Ellsworth had brought a motion to suppress the evidence found in the home, the trial court would need to decide whose version of what Monica Cooper told

14

Officer Hake, in the home, was true. We are unable to determine which version the trial court would adopt, so we must conclude that, at the least, the trial court was as likely to accept Kevin Hake's testimony as true as accepting Monica Cooper's testimony as true. The trial court could have even found that Monica Cooper told Officer Hake that Herbert Ellsworth was not in the house, but that Hake could have reasonably disbelieved Cooper because of her emotional condition and the nature of domestic violence. Under either Kevin Hake's testimony or Monica Cooper's testimony, the trial court could have determined that an emergency situation existed that justified Officer Hake's search of the home. Herbert Ellsworth holds the burden of showing that the motion to suppress evidence likely would have been granted. Based upon our analysis, Ellsworth does not meet his burden of probabilities. He has not shown the outcome of the prosecution would have been different.

## Restitution

Herbert Ellsworth assigns error to the trial court ordering restitution without sufficient evidence to support its order. We find no indication in the record that the trial court ordered restitution.

In his reply brief, Herbert Ellsworth writes that the original judgment and sentence ordered restitution, and thus infers that the court amended its judgment and sentence off the record. Ellsworth notes that the trial court has the authority to correct clerical mistakes under either CrR 7.8(a) or RAP 7.2(e), but writes, "Whatever procedure was

15

used, it does not appear that any record was made of when the change occurred." Reply Br. of Appellant at 3. Ellsworth asks this court to condemn the amendment and correct any error. In its present form, Herbert Ellsworth's judgment and sentence does not order restitution, if it ever did. There is thus no error for this court to address. Given the limited record, we find no cause to reprimand the trial court.

## *Double Jeopardy*

Herbert Ellsworth contends that his convictions for count I, manufacturing marijuana, and count II, possessing marijuana with the intent to distribute, violate constitutional prohibitions against double jeopardy. In other words, the jury convicted him twice of the same conduct. RCW 69.50.401 controls both crimes and reads, in relevant part:

> Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, *or* possess with intent to manufacture or deliver, a controlled substance.
>
> . . . .
> Any other controlled substance [not listed in (2)(b) or (2)(c)] classified in Schedule I, II, or III, is guilty of a class C felony punishable according to chapter 9A.20 RCW.

(Emphasis added.) RCW 69.50.101 defines "deliver" and "manufacture":

> (f) "Deliver" or "delivery," means the actual or constructive transfer from one person to another of a substance, whether or not there is an agency relationship.
>
> . . . .
> (q) "Manufacture" means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly or by extraction from substances of natural origin, or

16

independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Both the federal and state constitutions prohibit a person from being punished twice for the same offense, although within constitutional constraints the legislature is free to define crimes and punishments as it sees fit. *State v. Smith*, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013); *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Washington's double jeopardy clause offers the same protection as the federal constitution. *State v. Womac*, 160 Wn.2d 643, 650, 160 P.3d 40 (2007).

To analyze a double jeopardy claim, we first examine the statutory language to see if the applicable statutes expressly permit punishment for the same act or transaction. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). When the relevant statutes do not expressly disclose legislative intent to treat the charged crimes as the same offense, we determine whether the charged crimes are the same in law and fact, termed the same evidence test. *State v. Marchi*, 158 Wn. App. 823, 829, 243 P.3d 556 (2010); *State v. Adel*, 136 Wn.2d 629, 632, 965 P.2d 1072 (1998). The same evidence test mirrors the federal "same elements" standard adopted in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). *Adel*, 136 Wn.2d at 632. The *Blockburger* test is a rule of statutory construction used to discern legislative purpose. *Marchi*, 158 Wn. App. at 829. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be

applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. *Blockburger*, 284 U.S. at 304; *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 820, 100 P.3d 291 (2004).

This appeal resembles the circumstances underlying *State v. Maxfield*, 125 Wn.2d 378, 886 P.2d 123 (1994). In *Maxfield*, our state high court addressed whether double jeopardy protections precluded convictions for both manufacturing marijuana and possessing marijuana with intent to distribute. Law enforcement officers seized 5,200 grams of marijuana found growing in a garage near a house rented by Mark Maxfield. In addition to the marijuana found growing under artificial lights in the garage, officers also found in the house triple beam scales and a quantity of packaged marijuana contained in ziplock bags. The trial court concluded that the growing marijuana in the garage proved that the defendant manufactured marijuana and that the marijuana bundled up in packages in the house proved that the defendant was possessing marijuana with the intent to deliver. The trial court found Mark Maxfield guilty of both manufacturing marijuana and possessing marijuana with the intent to deliver it.

Our Supreme Court responded to and rejected Mark Maxfield's double jeopardy argument as follows:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. This test focuses primarily on whether or not each offense contains an additional

18

element not included in the other. Count 1 (manufacture) includes the element that the controlled substance be manufactured which includes planting, cultivation, growing, or harvesting. Count 2 includes the element that the defendant possessed the substance with the intent to deliver. Therefore, in this case, each offense contained an element not contained in the other; hence, they are not the "same offence" and double jeopardy is not violated.

*Maxfield*, 125 Wn.2d at 401 (citations omitted). RCW 69.50.401 thus defines four separate crimes: manufacturing a controlled substance, delivering a controlled substance, possessing a controlled substance with the intent to manufacture it, and possessing a controlled substance with the intent to deliver it. The facts of this case demonstrate the distinctness of two of these crimes.

Herbert Ellsworth manufactured marijuana in the purple room. To secure that conviction, the State pointed only to evidence found in the purple room. Ellsworth could have manufactured marijuana for his own use, without committing the separate crime of possessing with an intent to deliver. But Ellsworth went further. In his own bedroom, the scales, the firearm, the whiteboard, and the packaged marijuana displayed Ellsworth's intent to also deliver the marijuana he manufactured. To secure the conviction for possession of marijuana with the intent to deliver it, the State pointed only to evidence found in Herbert Ellsworth's room. These two convictions are both legally and factually distinct.

Herbert Ellsworth argues that this court should utilize the "unit of prosecution" analysis set forth in *State v. Adel*, 136 Wn.2d at 632, because both count I and count II

19

were in violation of the same statute. Washington courts have recognized, however, the legislature's ability to define separate offenses with a single statute. *See, e.g., State v. Duffey*, 97 Wn. App. 33, 37, 981 P.2d 1 (1999); *see also State v. Leach*, 113 Wn.2d 679, 684, 782 P.2d 552 (1989). That each count required the State prove distinct elements with distinct facts further demonstrates the inappropriateness of applying the "unit of prosecution" analysis in this case.

We deem *State v. Maxfield*, 125 Wn.2d 378, controlling. Herbert Ellsworth's convictions for manufacturing marijuana and possessing marijuana with the intent to deliver do not violate constitutional prohibitions against double jeopardy.

## *Same Criminal Conduct*

Herbert Ellsworth also contends that his convictions for count I, manufacturing marijuana, and count II, possessing marijuana with the intent to distribute, constitute the "same criminal conduct" for purposes of calculating his offender score under RCW 9.94A.589. A trial court's determination of what constitutes the same criminal conduct for purposes of calculating an offender score will not be reversed absent an abuse of discretion or misapplication of the law. *State v. Tili*, 139 Wn.2d 107, 122, 985 P.2d 365 (1999). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Mehrabian*, 175 Wn. App. 678, 710, 308 P.3d 660, *review denied*, 178 Wn.2d 1022 (2013).

RCW 9.94A.589(1)(a) provides:

Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the *same criminal conduct* then *those current offenses shall be counted as one crime.* Sentences imposed under this subsection shall be served concurrently. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

(Emphasis added.)

Our Supreme Court's holding in *Maxfield* disposes of this additional assignment of error. Addressing the same argument, the court held:

Focusing on the extent to which the criminal intent, as objectively viewed, changed from the crime of manufacture of a controlled substance to the crime of possession with intent to deliver, we conclude that the trial court here did not abuse its discretion in concluding these crimes did not constitute the same criminal conduct. In this case, the objective criminal intent is not the same for the two crimes defendant committed; there was a change in the criminal objective. In manufacturing, the objective intent is to produce the drug and the crime is complete without any showing of an intent to deliver.

In this case, there were different "objectives"; one was to grow the drug, the other was to deliver it to third persons. There was evidence in the stipulated findings of fact supporting each offense. The growing marijuana in the garage showed intent (in the past and present) to "manufacture" a controlled substance, whereas the marijuana found in the house in plastic baggies showed the defendant's intent to deliver the drugs in the future. Hence, the trial court did not abuse its discretion in refusing to treat the two crimes as the "same criminal conduct" for sentencing purposes.

*Maxfield*, 125 Wn.2d at 403 (citations omitted). Likewise, the sentencing court in this case did not abuse its discretion.

## CONCLUSION

We affirm Herbert Ellsworth's convictions and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Korsmo, J.